STATE OF NORTH CAROLINA v. GARY DEAN GREENE

No. 456A87

(Filed 9 February 1989)

**1. Searches and Seizures § 20— probable cause for search warrant—totality of circumstances test**

In applying the totality of the circumstances test for determining whether probable cause exists for issuance of a search warrant, the magistrate must consider all the evidence contained in the affidavit submitted to determine whether there exists a fair probability that evidence of a crime can be found in a particular place. The veracity and basis of knowledge of persons supplying hearsay information remain relevant but are no longer accorded independent status, as they were under the two-prong test of *Aguilar v. Texas* and *Spinelli v. United States*.

**2. Searches and Seizures § 24— confidential informant—probable cause for issuance of search warrant**

An officer's affidavit was sufficient under the totality of the circumstances to establish probable cause for the issuance of a warrant authorizing a search of defendant's trailer and car and the performance of luminol tests for traces of blood where the affidavit stated: a homicide victim appeared to have been beaten to death, resulting in a large amount of blood at the scene; a confidential informant had observed defendant on the day of the murder wearing clothing covered with what appeared to be blood and carrying what appeared to be the barrel of a long gun; the splintered stock of a gun was found at the crime scene; and the confidential informant was a "reliable citizen." The affidavit was not rendered insufficient to establish probable cause by the fact that the stock of the gun found at the crime scene ultimately proved to be unrelated to the murder or by failure of the affiant to reveal that the confidential informant had previously denied any knowledge of the victim's death and had been indicted eleven times for obtaining property by false pretenses. Assuming arguendo that the search was unlawful, admission of the luminol

1

State v. Greene

test results was harmless beyond a reasonable doubt where defendant was convicted largely upon the testimony of his girlfriend and the luminol tests did little to corroborate her testimony. N.C.G.S. § 15A-1443(b) (1988).

**3. Criminal Law § 75.4— in-custody statement without counsel—admission as harmless error**

Assuming error in the admission of defendant's in-custody statement without counsel that he did not know why his girlfriend turned the car around in a friend's driveway and drove off while the friend was being interviewed by an S.B.I. agent, admission of the statement in defendant's murder trial was harmless since the statement does nothing to inculpate defendant and is not probative of his guilt or innocence.

**4. Criminal Law § 173— in-custody statement—invited error**

Where a statement made by defendant during in-custody interrogation was elicited by defense counsel on cross-examination of an S.B.I. agent, any error in the admission of the statement was invited, and defendant cannot complain of such error on appeal. N.C.G.S. § 15A-1443(c) (1988).

**5. Criminal Law § 89.4— reasons for prior inconsistent statements**

Where evidence of a witness's prior inconsistent statements regarding defendant's involvement in the victim's death was introduced in defendant's murder trial, the witness's testimony that she "felt that he (defendant) had killed once and that he would kill again" and that "I told them that I believe if he was not locked up that he would kill me" was admissible to explain her reason for making the inconsistent statements.

**6. Criminal Law §§ 73.2, 73.3— victim's statement of intent to disinherit defendant—admissibility for nonhearsay purposes—state of mind exception to hearsay rule**

In a prosecution of defendant for the murder of his father, testimony by defendant's brother concerning a statement by the victim expressing an intent to disinherit defendant was admissible for the nonhearsay purpose of showing that ill will existed between defendant and his father. Even if the statement was hearsay, it was admissible under the state of mind exception to the hearsay rule. N.C.G.S. § 8C-1, Rule 803(3) (1988).

**7. Criminal Law § 112.1— reasonable doubt—failure to give tendered instruction**

The trial court's instructions on reasonable doubt were sufficient, and the trial court did not err in failing to give defendant's requested instruction that "proof beyond a reasonable doubt is proof that satisfies or entirely convinces you of the defendant's guilt."

**8. Criminal Law § 119— tendered instructions—omitted portions—failure to inform counsel—no material prejudice**

The trial court's failure to inform defense counsel that it would not use the full tendered instruction on reasonable doubt did not materially prejudice defendant's case because counsel relied on the omitted language in his closing argument to the jury where the court gave, in essence, the instruction defendant requested, and there was substantial evidence of defendant's guilt. N.C.G.S. § 15A-1231(b).

**State v. Greene**

**9. Criminal Law § 132— credibility of witness—jury question—refusal to set aside verdict**

The trial court did not abuse its discretion in the denial of defendant's motion to set aside guilty verdicts of first degree murder and armed robbery on the basis of the credibility of the State's principal witness, although the witness had made prior inconsistent statements about defendant's involvement in the crimes and had been indicted eleven times for obtaining property by false pretenses, where the witness's version of the events was corroborated in part by other witnesses and by the location of the murder weapon, and the credibility of the witness thus was for the jury to determine.

**10. Criminal Law § 135.9— brain damage—poor impulse control—alcoholism—failure to submit as separate mitigating circumstances**

The trial court in a first degree murder case did not err in failing to submit defendant's alleged brain damage, poor impulse control and alcoholism as separate and independent mitigating circumstances where the court incorporated these factors into its instructions on the mental or emotional disturbance and impaired capacity mitigating circumstances set forth in N.C.G.S. §§ 15A-2000(f)(2) and (6), and where the court submitted the mitigating circumstance of "any other circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value."

**11. Criminal Law § 135.9— mitigating circumstances—unanimity required**

Jury unanimity is required for a finding of a mitigating circumstance in a first degree murder case.

**12. Criminal Law § 135.8— first degree murder—armed robbery as aggravating circumstance—sufficiency of evidence**

The evidence supported the jury's finding of the aggravating circumstance that defendant was engaged in the commission of an armed robbery when he murdered his father where defendant's girlfriend testified: defendant went to his father's house carrying a shotgun; he returned with "a good-sized wad of money," belonging to his father, which he later counted as fourteen hundred dollars; and defendant returned from his father's house covered with blood and told her he had beaten his father to death using the shotgun.

**13. Criminal Law § 135.10— first degree murder—death penalty not disproportionate**

A sentence of death imposed on defendant for first degree murder was not disproportionate to the penalty imposed in similar cases where the victim was defendant's father; defendant was thirty-seven years old at the time of the crime; defendant brutally beat the victim to death to steal his money and secure an inheritance; the jury found premeditation and deliberation on defendant's part; and the case required the jury to weigh the aggravating circumstance that the murder was committed during an armed robbery against three nonstatutory mitigating circumstances and the statutory "catch-all" mitigating circumstance.

Chief Justice Exum concurring.

Justice Frye dissenting as to sentence.

APPEAL of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing the sentence of death entered by *Ferrell, J.*, at the 10 August 1987 Criminal Session of Superior Court, CALDWELL County. Heard in the Supreme Court 10 October 1988.

*Lacy H. Thornburg, Attorney General, by Thomas J. Ziko, Assistant Attorney General, and Edwin M. Speas, Jr., Special Deputy Attorney General, for the State.*

*David S. Lackey, Nancy Einstein, and David A. Swanson for defendant-appellant.*

WHICHARD, Justice.

Defendant was convicted of first degree murder and robbery with a dangerous weapon. The jury recommended the death sentence for the murder, and the trial court sentenced accordingly. The trial court also sentenced defendant to forty years imprisonment for the armed robbery. We find no prejudicial error.

The State's evidence, in pertinent summary, showed the following:

The victim, defendant's father, was a vigorous seventy-four-year-old male. Defendant's mother worked the second shift at a factory. She arrived home after work at 9:15 p.m. on 1 May 1986 and found her husband's dead body at the bottom of the basement steps.

Detective Barlow from the Caldwell County Sheriff's Department investigated the scene. He noted that the basement floor was wet. Two freezers were sprayed with blood. There was a broken piece of gunstock in a paper bag in the middle of the basement. The gunstock was not wet or bloody.

The pathologist who performed an autopsy on the victim's body testified that there were a variety of lacerations and bruises about the face, chest, mid-back and shoulders. The victim's arms were bruised and abraded in several places and his little finger was broken. His breastbone and jaw were also broken. Internal examination of organs revealed diffuse hemorrhaging around the brain. In the pathologist's opinion, the trauma to the brain was the actual cause of death. The pathologist thought at the time that the victim had been beaten to death, but the police thought

it possible that he had died after falling in the well in the basement and climbing back out, then falling on the stairs. The doctor listed the cause of death as multiple traumatic injuries of undetermined cause because he felt he could not conclusively determine that the injuries were sustained by a beating rather than a fall.

The case remained under investigation for approximately a month while Detective Barlow interviewed family, friends, and neighbors of the victim. Both defendant and his girlfriend denied any knowledge of the death. The detective then closed the case because he could not prove that the death was not accidental.

In August 1986 the State Bureau of Investigation reopened the investigation and assigned Agent Knowles to the case. On 27 October 1986 Agent Knowles interviewed Ms. Newton, a friend of defendant's girlfriend, Ms. Hopson. As Agent Knowles was interviewing Ms. Newton, defendant and Ms. Hopson drove into Ms. Newton's driveway, then turned around and drove off. Agent Knowles left Ms. Newton's trailer and pursued them. Defendant ducked down in the car so that he was not visible from the outside. Agent Knowles stopped Ms. Hopson and asked her to come to the police station to answer some questions. She complied, but when questioned she reiterated that she knew nothing about the victim's death. Agent Knowles had seen defendant in Ms. Hopson's car as he and Ms. Hopson got out of their cars at the station. He asked Ms. Hopson to ask defendant to come inside for questioning. Ms. Hopson went outside but returned and reported that defendant had left.

When Agent Knowles returned home that evening, he received a message asking him to call Ms. Newton. Ms. Newton told Agent Knowles over the telephone that Ms. Hopson had told her that defendant had killed his father.

Two days later Ms. Hopson gave officers a statement implicating defendant in the death of his father. Based on that statement the officers secured an arrest warrant and a warrant to search defendant's residence and conduct luminol examinations to reveal traces of blood.

Ms. Hopson testified at trial that she had lived with defendant from the summer of 1984 until July of 1986. She was living with defendant in a trailer behind his parents' house on 1 May

1986. Ms. Hopson testified that defendant was drinking beer on 1 May 1986. He complained that he did not have any money and told her he was going to kill his father because, if his mother died before his father, his father would give everything to defendant's brothers and defendant would not inherit anything. Defendant said he would make it look like an accident. He took an old shotgun from his trailer and walked off toward his father's house shortly after 7:00 p.m.

Ms. Hopson testified that she could not believe defendant would kill his father. She went inside the trailer and watched television. Defendant returned an hour later covered with blood and holding the shotgun. Defendant told Ms. Hopson he had beaten his father to death and to get him a complete change of clothes. After bathing and changing clothes, defendant placed his bloody clothes and the shotgun in a grocery bag. Ms. Hopson saw that defendant had a "good-sized wad of money in his hand."

The two went in defendant's car to Ms. Hopson's mother's house to return her dogs. Ms. Hopson told her mother that defendant had killed his father. Along the way defendant threw the bag containing his clothes and the gun into a river. A gun was later recovered from the river in the area where Ms. Hopson said defendant had thrown the clothes and gun.

Ms. Hopson lived with defendant until July 1986, when defendant's mother asked her to move out of defendant's trailer. She moved out but was still seeing defendant about twice a week at the time of his arrest. Ms. Hopson moved in with Ms. Newton. Both Ms. Hopson and Ms. Newton testified that Ms. Hopson told Ms. Newton one night when she was drinking that defendant had killed his father.

The State presented several witnesses who corroborated Ms. Hopson's version of the events, including Ms. Hopson's mother, Ms. Newton, and Ms. Newton's boyfriend. Defendant did not offer evidence. Defense counsel moved for a directed verdict at the close of the State's evidence, arguing that only Ms. Hopson's testimony tied defendant to the death of his father and attacking her credibility. The trial court denied the motion.

The jury found defendant guilty of first degree murder based on both premeditation and deliberation and the felony-murder rule. It also found him guilty of armed robbery.

Following a capital sentencing hearing, the jury found as the sole aggravating circumstance that defendant was engaged in the commission of a robbery with a dangerous weapon when he committed the murder. The State submitted as an aggravating circumstance that the murder was especially heinous, atrocious or cruel, but the jury rejected this circumstance.

The jury found the following four mitigating circumstances: that defendant's intelligence quotient of eighty-one placed him in the lowest ten percent of the population; that defendant was a model prisoner in jail while awaiting trial; that defendant was a person of good behavior except when he was drinking alcohol; and the catch-all provision of "[a]ny other circumstance arising from the evidence which the jury deems to have mitigating value." N.C.G.S. § 15A-2000(f)(9) (1988). It did not specify what additional circumstance(s) it found to have mitigating value.

Upon finding that the mitigating circumstances were insufficient to outweigh the aggravating circumstance, and that the aggravating circumstance was sufficiently substantial to call for the death penalty, the jury recommended a sentence of death.

GUILT PHASE

Defendant first contends that the affidavits used to obtain the warrants authorizing a search of defendant's trailer and car and the performance of luminol tests were insufficient in that they showed no probable cause and provided no information as to the veracity of the "confidential informant" supplying the information. Defendant argues that the trial court thus erred in denying defendant's motion to suppress evidence seized from his home pursuant to the search warrant.

Defendant objects only to the admission of evidence resulting from the luminol examination for traces of blood. The affidavit in question stated:

On or about May 1, 1986, [the victim] was found dead in the basement of his residence. Death appeared to have been from a severe beating. A large amount of blood was found around the body and on the opposite side of the basement in a spray pattern on the walls and appliances.

The autopsy report listed the cause of death as multiple traumatic injuries, including several fractures, lacerations, contusions, and abrasions. A separate report from the Chief Medical Examiner's Office in Chapel Hill stated that the injuries were consistant [sic] with a severe beating. A severe beating could result in a spray pattern of blood such as those observed at the scene.

On October 29, 1986 this applicant received information from a confidential informant that on May 1, 1986 the confidential informant observed [defendant] enter his residence wearing clothing covered with what appeared to be blood and carrying what appeared to be the barrel of a long gun. [Defendant] left his residence after only a short period of time wearing different clothing. The confidential informant observed a bag and the long gun barrel be placed in a Pontiac Firebird parked at the residence of [defendant]. The informant knows the car as belonging to [defendant]. That [defendant] and a white female then left the residence in the Firebird.

The stock of a long gun was found in the basement of the victim's residence on the night of the incident. The stock was splintered and appeared to have been broken by force.

Defendant contends this affidavit does not contain sufficient facts for a magistrate to find probable cause for a search. We disagree.

[1] Whether an applicant has submitted sufficient evidence to establish probable cause to issue a search warrant is a "nontechnical, common-sense [judgment] of laymen applying a standard less demanding than those used in more formal legal proceedings." *Illinois v. Gates*, 462 U.S. 213, 235-36, 76 L.Ed. 2d 527, 546 (1983). This Court has adopted the *Gates* totality of the circumstances test for determining whether probable cause exists for issuance of a search warrant under the state constitution. *State v. Arrington*, 311 N.C. 633, 643, 319 S.E. 2d 254, 261 (1984). In applying this test, the magistrate must consider all the evidence contained in the affidavit submitted to determine whether there exists a fair probability that evidence of a crime can be found in a particular place. The veracity and basis of knowledge of persons supplying hearsay information remain relevant but are no longer accorded independent status, as they were under the two-prong test of

*Aguilar v. Texas* and *Spinelli v. United States. See Spinelli,* 393 U.S. 410, 21 L.Ed. 2d 637 (1969); *Aguilar,* 378 U.S. 108, 12 L.Ed. 2d 723 (1964). Reviewing courts should give great deference to the magistrate's determination of probable cause and should not conduct a de novo review of the evidence to determine whether probable cause existed at the time the warrant was issued. *State v. Williams,* 319 N.C. 73, 81, 352 S.E. 2d 428, 434 (1987); *State v. Arrington,* 311 N.C. at 638, 319 S.E. 2d at 258.

[2]   The affidavit in this case stated that the victim appeared to have been beaten to death, resulting in a large amount of blood at the scene. The confidential informant—Ms. Hopson—stated to the affiant that she had observed the defendant on the day of the murder "wearing clothing covered with what appeared to be blood and carrying what appeared to be the barrel of a long gun." The stock of a gun was found at the scene of the crime. The incriminating information given by the confidential informant was based upon the informant's personal observations. Further, the fact that a splintered stock of a long gun was found in the basement of the victim's home on the night of the killing provided independent corroboration for the informant's statement that the defendant was carrying what appeared to be the barrel of a long gun. In an accompanying affidavit supporting the application for the search warrant, the applicant described the confidential informant as a "reliable citizen." Taken as a whole, and giving due deference to the magistrate's determination, we conclude that the affidavit contains sufficient information to support a finding of probable cause.

Defendant argues that the splintered stock of the gun found in the victim's basement ultimately proved to be unrelated to the crime and that this fact should have some bearing on the propriety of the magistrate's determination of probable cause. This argument is without merit. The magistrate must consider the evidence presented at the time of the warrant application. The splintered gunstock was found in the basement on 1 May 1986. Ms. Hopson stated on 29 October 1986 that when defendant came back to the trailer from his father's house, the shotgun was broken. The warrant was issued on 5 November 1986. Until the gun was recovered from the river on 12 November 1986, neither the affiant nor the magistrate would have had reason to believe the alleged murder weapon was not splintered or broken and thus to

conclude that the presence of the splintered gunstock in the base-ment failed to corroborate Ms. Hopson's statement. Reviewing courts must not conduct a de novo review but must view the evidence as presented to the magistrate at the time of the war-rant application. *Arrington,* 311 N.C. at 638, 319 S.E. 2d at 258.

Defendant also argues that the affiant deliberately withheld from the magistrate information concerning the informant's veracity. Specifically, the affiant did not reveal that the inform-ant, Ms. Hopson, previously had denied any knowledge of the vic-tim's death and had told police defendant had been with her the entire evening of 1 May 1986. In addition, the informant had been indicted eleven times for obtaining property by false pretenses. However, no evidence was presented at trial that the affiant knew of Ms. Hopson's past record when he applied for the search warrant. The affiant described the informant as a "reliable citi-zen" and did not vouch for her reputation for truthfulness. Under the totality of the circumstances test, the affidavit contains suffi-cient facts to support the magistrate's finding of probable cause.

Finally, assuming arguendo that the search was unlawful, ad-mission of the fruits of the search was harmless beyond a reason-able doubt. N.C.G.S. § 15A-1443(b) (1988); *State v. Autry,* 321 N.C. 392, 399-401, 364 S.E. 2d 341, 346-47 (1988). The luminol tests con-ducted in defendant's trailer revealed traces of blood, but those traces fit no distinctive pattern from which investigating officers could reconstruct an incriminating scenario. An expert witness in forensic serology testified that luminol tests will react to substances other than human blood, including animal blood. In ad-dition, the expert witness testified that luminol will react with traces of blood up to ten years after blood is spilled or placed on a surface. Evidence was presented that many persons other than defendant had lived in the trailer during the last five years, and that defendant was a hunter. In this factual context, the mere fact that chemical tests revealed traces of blood in no distinct pat-tern is not particularly probative of defendant's guilt or in-nocence. Defendant was convicted largely upon the testimony of Ms. Hopson, and the luminol tests did little to corroborate her testimony.

Defendant next assigns error to the denial of his motion to suppress an in-custody statement he made outside the presence of

counsel. During the in-custody interrogation defendant made several statements, two of which were introduced into evidence. One was elicited by defense counsel on cross-examination and thus its admission, if error, was invited error. N.C.G.S. § 15A-1443(c) (1988). For reasons that follow, admission of the other statement, assuming error, was harmless.

On the night of 27 October 1986 Agent Knowles was interviewing Ms. Newton in her home. During the interview a car pulled into the driveway, turned around, and left. Agent Knowles got into his car and followed the other vehicle until it stopped some distance down the road. The female driver of the other car approached Agent Knowles in his car and identified herself as Ms. Hopson. She followed Agent Knowles to the police station at his request and answered questions there. Defendant was also in Ms. Hopson's car but left while Ms. Hopson was inside the police station.

The next evening Agent Knowles interviewed defendant at the home of his ex-wife, who was present during the interview. Defendant denied that he had been with Ms. Hopson the previous night. The next day Ms. Hopson gave the investigators a statement implicating defendant in the murder. The investigators arrested defendant late that night. The following day, 30 October 1986, defendant appeared in district court. The court appointed counsel for defendant at his request. Following his appearance, the court remanded defendant to the custody of the Caldwell County Sheriff.

Agent Knowles interviewed defendant's ex-wife. She told him that she and a number of defendant's relatives had bought ceiling fans from defendant "at a very cheap price." This information led Agent Knowles to suspect that defendant was fencing stolen property. On 10 November 1986 Agent Knowles and Detective Barlow visited defendant in his jail cell. They did not notify defendant's counsel before interviewing defendant. The officers advised defendant they were there to talk to him about the ceiling fans, not the death of his father. Before they began their questioning, they advised defendant of all his *Miranda* rights. Defendant signed a waiver of rights form.

Agent Knowles and Detective Barlow began to question defendant regarding the ceiling fans. After about fifteen to thirty

minutes defendant stated that he wanted to talk to the officers about the death of his father. The officers advised defendant that they were not there to talk to him about his father's death, that he had the right to remain silent, and that he was not required to talk to them about his father's death. Detective Barlow testified at trial that defendant stated "that he wanted to get something straight and talk about the death of his father. . . . [He] stated that on the date that he and Cindy Jones [Ms. Hopson] turned around at Susan Newton's residence, that Cindy had said that she was going to see Susan and he did not know why she had turned around."

[3] Admission of this statement implicates defendant's rights under the Sixth Amendment of the United States Constitution. Therefore, "[t]he burden is upon the State to demonstrate, beyond a reasonable doubt, that [any] error was harmless." N.C.G.S. § 15A-1443(b) (1988). Even under that exacting standard, we find admission of defendant's statement that he did not know why Ms. Hopson turned the car around in the driveway to be harmless beyond a reasonable doubt. The statement does nothing to inculpate defendant and is not probative of his guilt or innocence. Assuming error, arguendo, we hold it harmless beyond a reasonable doubt. *See State v. Detter*, 298 N.C. 604, 626-27, 260 S.E. 2d 567, 583 (1979).

[4] Agent Knowles also testified regarding the interrogation concerning the ceiling fans. On cross-examination, he testified that during the interrogation defendant explained why he denied being with Ms. Hopson on 27 October when questioned at his ex-wife's house. Defendant told Agent Knowles he was "wanting to have two women" and did not want his ex-wife to know he had been with Ms. Hopson the evening before. Defense counsel elicited this latter statement on cross-examination and did not object to its admission at trial. Any error thus was invited and defendant cannot complain of such error on appeal. N.C.G.S. § 15A-1443(c) (1988). "Defendant cannot invalidate a trial by . . . eliciting evidence on cross-examination which he might have rightfully excluded if the same evidence had been offered by the State. . . . Neither is invited error ground for a new trial." *State v. Chatman*, 308 N.C. 169, 177, 301 S.E. 2d 71, 76 (1983) (quoting *State v. Waddell*, 289 N.C. 19, 25, 220 S.E. 2d 293, 298 (1975),

*death sentence vacated,* 428 U.S. 904, 49 L.Ed. 2d 1210 (1976) (citations omitted) ).

**[5]** Defendant assigns error to the denial of his motion to strike Ms. Hopson's testimony that she "felt that he (defendant) had killed once and he would kill again." Defendant also assigns error to the admission of, and denial of his motion to strike, the following testimony by Ms. Hopson: "I told them that I believe if he was not locked up that he would kill me. There is no doubt in my mind that he would kill me." Defendant argues that these statements were inadmissible under N.C.G.S. § 8C-1, Rules 602 and 701, as opinions or conclusions of a lay witness not based on personal knowledge.

On the night of the crime and again on 27 October 1986, Ms. Hopson told investigating officers she was with defendant the night of 1 May 1986. She denied any knowledge of defendant's involvement in the death. On 29 October she recanted and gave the officers a statement implicating defendant in the murder. Defense counsel brought out these inconsistencies in Ms. Hopson's statements during cross-examination of Detective Barlow, which preceded Ms. Hopson's testimony.

During its direct examination of Ms. Hopson, the State elicited her reasons for lying to the police prior to 29 October 1986. The following exchange took place:

Q: Did you have a reason for not telling them what you knew?

Mr. Lackey: Objection.

Court: Overruled.

A: Gary told me . . . .

Mr. Lackey: Objection.

Court: Overruled.

A: He told me that he would kill me if I ever breathed a word to anybody and after what he done, I believed him.

When questioned regarding her failure to inform the police of defendant's involvement in his father's death during her interview with Agent Knowles on 27 October 1986, Ms. Hopson testified as follows:

Q: Did you ever have a reason for telling that story?

A: *I felt that he had killed once and that he would kill again.*

Mr. Lackey: Object and move to strike that.

Court: Overruled.

Later, during direct examination, the following exchange took place:

Q: When you talked to the officers at your mother's house, what did you tell them, if anything, before you told them about Gary killing his father?

A: I was assured by them if I told them what I knew that Gary would be picked up and locked up.

During cross-examination Ms. Hopson admitted that she had had several opportunities to speak to law enforcement officers outside the presence of defendant. On redirect examination, the State again questioned Ms. Hopson's motive for withholding evidence of defendant's involvement in his father's death. The prosecutor asked:

Q: What, if anything, did you tell the officers about your fear of [defendant] before you made any statement to them?

Mr. Lackey: Objection.

Court: Overruled.

A: *I told them that I believe if he was not locked up that he would kill me. There is no doubt in my mind that he would kill me.*

Mr. Lackey: Move to strike the answer.

Court: Motion is denied.

Once a witness's prior inconsistent statements have been introduced into evidence, the witness is entitled to explain the inconsistency. *State v. Carey*, 285 N.C. 509, 518-19, 206 S.E. 2d 222, 228 (1974), *death sentence vacated*, 428 U.S. 904, 49 L.Ed. 2d 1209 (1976); *State v. Mosley*, 33 N.C. App. 337, 235 S.E. 2d 261, *disc. rev. denied*, 293 N.C. 162, 236 S.E. 2d 706 (1977); 1 Brandis on North Carolina Evidence § 46, at 221 (3d ed. 1988) ("After the

witness is shown to have made an apparently inconsistent statement he is entitled to explain it away, if he can, by showing that it was not in fact inconsistent or by giving his reasons for making it."). Because evidence of Ms. Hopson's prior inconsistent statements regarding defendant's involvement in his father's death was introduced at trial, she was entitled to explain her reasons for giving the conflicting accounts of her and defendant's activities on the night of the murder. These assignments of error are therefore overruled.

[6] Defendant next contends the trial court erred in admitting the following testimony by defendant's brother:

Q. What, if anything, else did he [*i.e.*, the victim] say about the land?

[Objection on hearsay grounds overruled.]

A. He told me that [defendant] wanted the place where the trailer was at and if he didn't straight up [sic] that he was not giving it to him.

Defendant argues that this statement was hearsay that prejudiced him by tending to show his motive for killing his father.[1]

The statement was admissible on either of two grounds:

First, it was admissible to show that ill will existed between defendant and his father. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence *to prove the truth of the matter asserted.*" N.C.G.S. § 8C-1, Rule 801(c) (1988) (emphasis added). "[W]henever an extrajudicial statement is offered for a purpose other than proving the truth of the matter asserted, it is not hearsay." *State v. Maynard,* 311 N.C. 1, 15-16, 316 S.E. 2d 197, 205, *cert. denied,* 469 U.S. 963, 83 L.Ed. 2d 299 (1984). *See also* 1 Brandis on North Carolina Evidence § 141, at 643 (3d ed. 1988).

---

1. The State's theory of defendant's motive also was supported by Ms. Hopson's testimony that defendant told her

that [defendant's mother] would die before his daddy and if she died before his daddy then he would not get nothing, that he would give everything away to [defendant's brothers] so they would have control of it all.

The testimony in question was probative of something other than the truth of the matter asserted. It tended to show that the victim intended to disinherit defendant and to show ill will between defendant and the victim. It thus supported the State's theory concerning defendant's motive for murdering his father, and it was therefore admissible for a nonhearsay purpose.

Second, if it was hearsay the testimony was admissible under the state of mind exception to the hearsay rule.

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(3) Then Existing Mental, Emotional, or Physical Condition.— A statement of the declarant's then existing state of mind, . . . (such as intent, plan, motive, design, . . .), but not including a statement of memory or belief to prove the fact remembered or believed . . . .

N.C.G.S. § 8C-1, Rule 803(3) (1988). "Evidence tending to show a presently existing state of mind is admissible if the state of mind sought to be proved is relevant and the prejudicial effect of the evidence does not outweigh its probative value." *State v. Locklear*, 320 N.C. 754, 760, 360 S.E. 2d 682, 685 (1987). Under the state of mind exception, when intent is directly in issue a declarant's statements "relative to his then existing intention are admitted without question." 1 Brandis on North Carolina Evidence § 162, at 733 (3d ed. 1988). *See Maynard*, 311 N.C. 1, 316 S.E. 2d 197 (pre-Rules case, murder victim's statement that he would testify against defendant properly admitted as evidence of defendant's motive). Here, the victim's state of mind regarding his intention to disinherit defendant was relevant to the issue of defendant's motive. The testimony in question thus was admissible under the state of mind exception to the hearsay rule.

[7] Defendant next assigns error to the charge on reasonable doubt. Prior to closing arguments, defendant requested in writing the following instruction:

A reasonable doubt is a doubt based on reason and common sense, arising out of some or all of the evidence that has been presented, or lack or insufficiency of the evidence, as

the case may be. Proof beyond a reasonable doubt is proof that fully satisfies or entirely convinces you of the defendant's guilt.

*See* N.C.P.I. — Crim. 101.10. The trial court charged instead:

A reasonable doubt, members of the jury, is not a mere possible doubt, for most things that relate to human affairs are open to some possible or imaginary doubt. But rather a reasonable doubt is a fair doubt based on reason and common sense growing out of some evidence or lack of evidence in the case.

After the court completed its charge, defense counsel specifically requested the instruction that "proof beyond a reasonable doubt is proof that fully satisfies or entirely convinces you of the defendant's guilt," stating that he had told the jury in closing arguments it would hear that definition from the court. The court declined to give the additional instruction.

Defendant first argues that the instruction given did not substantially comply with definitions of reasonable doubt previously approved by this Court. "Absent request, the trial court is not required to define reasonable doubt, but if it undertakes to do so, the definition must be substantially correct." *State v. Wells*, 290 N.C. 485, 492, 226 S.E. 2d 325, 330 (1976). However, the court is not required to read the requested instruction verbatim. "The law does not require any set formula in defining reasonable doubt." *State v. Withers*, 271 N.C. 364, 368, 156 S.E. 2d 733, 736 (1967) (quoting *State v. Hammonds*, 241 N.C. 226, 232, 85 S.E. 2d 133, 138 (1954)). While the language defendant requested was appropriate, it was not essential to an accurate definition of reasonable doubt, and the refusal to give the requested instruction verbatim was not error. "Brevity makes for clarity and we think the jury fully understood the meaning of reasonable doubt as that term is employed in the administration of the criminal laws." *Wells*, 290 N.C. at 492, 226 S.E. 2d at 330. *See also State v. Oliver*, 85 N.C. App. 1, 354 S.E. 2d 527 (instruction on reasonable doubt omitting phrase "convinced to a moral certainty" not error), *disc. rev. denied*, 320 N.C. 174, 358 S.E. 2d 64 (1987).

[8] Defendant further argues that the court erred by failing to notify defense counsel that it would not give the complete requested instruction. N.C.G.S. § 15A-1231(b) provides:

> Before the arguments to the jury, the judge must hold a recorded conference on instructions . . . . At the conference the judge must inform the parties . . . of what, if any, parts of tendered instructions will be given. . . . The failure of the judge to comply fully with the provisions of this subsection does not constitute grounds for appeal unless his failure . . . materially prejudiced the case of the defendant.

N.C.G.S. § 15A-1231(b) (1988). Defendant contends the court's failure to inform counsel that it would not use the full tendered instruction materially prejudiced his case because counsel relied on the omitted language in his closing argument to the jury. We disagree. The court gave, in essence, the instruction defendant requested. In light of this, and of the substantial evidence of defendant's guilt, we are satisfied that defendant's case was not materially prejudiced by the instruction given.

[9] Defendant assigns error to the denial of his motion to set aside the verdicts on the grounds that they are the result of passion and prejudice and are contrary to the greater weight of the evidence. He attacks the credibility of the State's chief witness, Ms. Hopson, pointing to the statements she gave police which conflicted with her statements at trial. He argues that her changed account coincided with his resumption of his relationship with his ex-wife. He points to Ms. Hopson's past record of eleven indictments for false pretenses. Finally, he calls attention to the testimony of two neighbors of the victim, who stated that they saw the victim alive after defendant left the trailer park the night of the murder.

The trial court must exercise its sound discretion when ruling on a motion to set aside the verdict as being against the greater weight of the evidence. *State v. Wilson*, 313 N.C. 516, 538, 330 S.E. 2d 450, 465 (1985). This decision is not reviewable absent an abuse of discretion. *Id.* We find no abuse of discretion in the denial of the motion here. Ms. Hopson's version of the events was corroborated in part by other witnesses and by the location of the murder weapon. Defendant attacked her credibility on cross-examination, and the jury was left to weigh her testimony in light of her prior inconsistent statements and record of untruthfulness. The trial court properly concluded that the credibility of the State's principal witness was for the jury to determine.

We conclude that the guilt phase of defendant's trial was fair and free of prejudicial error.

SENTENCING PHASE

[10]  Prior to arguments on sentencing, defendant submitted a list of ten mitigating circumstances. He assigns error to the court's refusal to submit three of the proposed circumstances to the jury as independent mitigating circumstances.

In pertinent part, the list was as follows:

1. The capital felony was committed while the Defendant was under the influence of mental or emotional disturbance. G.S. 15A-2000(f)(2).

2. The capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired. G.S. 15A-2000(6).

. . .

4. The Defendant suffers from brain damage which impairs his judgment.

5. The Defendant suffers from poor impulse control.

. . .

7. The Defendant has a significant drinking problem.

. . .

10. Any other circumstance arising from the evidence which the jury deems to have mitigating value.

The court refused to submit numbers 4, 5, and 7 as separate mitigating circumstances, but instead incorporated their content into its instructions on numbers 1 and 2. When instructing on the statutory mitigating circumstance of commission while under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2), the court stated:

You would find this mitigating circumstance if you find that the defendant suffered from brain damage which impaired his judgment, if you find that he had poor impulse control, if you find that he was under the influence of alcoholic beverages

and that as a result that the defendant was under the influence of mental and/or emotional disturbance when he killed [the victim] . . . .

The court next instructed regarding the statutory mitigating circumstance of impaired capacity to appreciate the criminality of one's conduct or to conform one's conduct to the requirements of law. N.C.G.S. § 15A-2000(f)(6) (1988). The court stated:

[T]he defendant need not wholly lack all capacity to conform. It is enough that such capacity as he might otherwise have had in the absence of brain damage which impaired his judgment or poor impulse control or under the influence of alcoholic beverages, is lessened or diminished because of such causes. You would find this mitigating circumstance if you find that the defendant suffered from brain damage which impaired his judgment, suffered from poor impulse control, suffered from alcoholic influence and that this impaired his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law . . . .

In addition, the court instructed the jury that it could find "any other circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value."

The sentencer in capital cases must "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Skipper v. South Carolina,* 476 U.S. 1, 4, 90 L.Ed. 2d 1, 6 (1986) (quoting *Eddings v. Oklahoma,* 455 U.S. 104, 110, 71 L.Ed. 2d 1, 8 (1982) (emphasis in original)). Here, the jury was not precluded from considering evidence of defendant's alleged brain damage, poor impulse control, and alcoholism. It heard testimony from a clinical psychologist regarding all three of these factors. Defendant's ex-wife testified that defendant had a drinking problem which was the source of their marital discord, but that defendant was a kind and generous man when not drinking. The trial court instructed that if the jury found that defendant suffered from either brain damage, poor impulse control, or a significant drinking problem, it should find that he committed the murder while under the influence of a mental or emotional disturbance and that his capacity to appreciate the criminality of his

conduct, or to conform his conduct to the requirements of law, was impaired. In addition, the court submitted to the jury the mitigating circumstance of "any other circumstance or circumstances arising from the evidence which you the jury deem to have mitigating value." The court thus not only allowed—but actually instructed—the jury to consider evidence of defendant's alleged brain damage, poor impulse control, and drinking problem.

Defendant's argument is rooted in the notion that the jury would have been more impressed with the mitigating value of the proffered evidence if it had been categorized into three separate mitigating circumstances rather than consolidated into the two statutory mitigating circumstances and the "catch-all" circumstance. We reject this "mechanical[,] mathematical approach" to capital sentencing. *See State v. McDougall*, 308 N.C. 1, 32, 301 S.E. 2d 308, 326, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 173 (1983). The trial court recognized the danger of a numerical approach when it instructed the jury:

> After considering the totality of the aggravating circumstances and mitigating circumstances, you must be convinced beyond a reasonable doubt that the imposition of the death penalty is justified and appropriate in this case before you can answer this issue, yes. In so doing, you are not applying a mathematical formula. For example, three circumstances of one kind do not automatically and of necessity outweigh one circumstance of another kind. The number of circumstances found is only one consideration in determining which circumstances outweigh others. You may very properly emphasize one circumstance more than another in a particular case. You must consider the relative substantiality and persuasiveness of the existing aggravating and mitigating circumstances in making this determination.

This partial instruction correctly states the law. The refusal to submit the proposed circumstances separately and independently was within the dictates of constitutional precedent and was not error. *See State v. Fullwood*, 323 N.C. 371, 393, 373 S.E. 2d 518, 531 (1988); *State v. Lloyd*, 321 N.C. 301, 313-14, 364 S.E. 2d 316, 324-25, *vacated on other grounds*, --- U.S. ---, 102 L.Ed. 2d 18, *judgment reinstated*, 323 N.C. 622, 374 S.E. 2d 277 (1988).

[11] Defendant next argues that the court erred in denying his motion to set aside the sentencing recommendation and the death sentence on the ground that the jury did not answer two of the mitigating circumstances unanimously. In answer to the question, "Was this murder committed while the defendant was under the influence of mental or emotional disturbance?" the jury responded, "No. Not unanimous." The jury gave an identical response to the proposed mitigating circumstance, "Did the defendant have a good relationship with the deceased prior to May 1, 1986?" We have previously rejected the argument that *Mills v. Maryland*, 486 U.S. ---, 100 L.Ed. 2d 384 (1988), requires us to overrule our case law holding that jury unanimity is required for a finding of a mitigating circumstance. *State v. McKoy*, 323 N.C. 1, 44, 372 S.E. 2d 12, 35-36 (1988). For the reasons stated in *McKoy*, this assignment of error is overruled.

We conclude that the sentencing phase of defendant's trial was fair and free of prejudicial error.

PROPORTIONALITY REVIEW

Statutory provisions governing capital sentencing direct this Court to review the record and determine (1) whether it supports the jury's finding of the aggravating circumstance(s) upon which the sentencing court based the sentence of death, (2) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (3) whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2) (1988).

[12] We first consider whether the record supports the jury's finding of the aggravating circumstance. The prosecution submitted two aggravating circumstances to the jury: was the murder committed while the defendant was engaged in the commission of robbery with a dangerous weapon, and was the murder especially heinous, atrocious or cruel. The jury found the former but rejected the latter.

"Armed robbery is the taking of personal property from the person or presence of another, by the use or threatened use of a dangerous weapon, whereby the victim's life is endangered or threatened." *State v. Rasor*, 319 N.C. 577, 587, 356 S.E. 2d 328,

334 (1987); N.C.G.S. § 14-87(a) (1986). Ms. Hopson testified that defendant went to his father's house carrying a shotgun. He returned with "a good-sized wad of money," belonging to his father, which he later counted as fourteen hundred dollars. Ms. Hopson testified that defendant returned from his father's house covered with blood and told her he had beaten his father to death using the shotgun. This evidence is sufficient to support a finding of the aggravating circumstance of commission of the murder while defendant was engaged in an armed robbery.

After reviewing the transcript, record on appeal, briefs, and oral arguments, we conclude that nothing in the record suggests that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

[13]  We turn next to the task of proportionality review, wherein we "compare the case at bar with other cases in the pool which are roughly similar with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and defendant's character, background, and physical and mental condition." *State v. Lawson,* 310 N.C. 632, 648, 314 S.E. 2d 493, 503 (1984), *cert. denied,* 471 U.S. 1120, 86 L.Ed. 2d 267 (1985). A finding that juries consistently have returned life sentences in similar cases will provide us with "a strong basis for concluding that a death sentence in the case under review is excessive or disproportionate." *Id.*

The pool of similar cases includes all cases tried as capital cases since the passage of our capital punishment statute, 1 June 1977, which have been reviewed on direct appeal by this Court, and in which the jury recommended death or life imprisonment or the trial court imposed life imprisonment after the jury failed to agree upon a sentencing recommendation. *State v. Williams,* 308 N.C. 47, 79, 301 S.E. 2d 335, 355, *cert. denied,* 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied,* 464 U.S. 1004, 78 L.Ed. 2d 704 (1983). The pool is further restricted to cases found by this Court to be free from error in both phases of the trial. *State v. Goodman,* 298 N.C. 1, 35, 257 S.E. 2d 569, 591 (1979).

The sole aggravating circumstance found in this case was commission of the murder during a robbery with a dangerous weapon. The jury found the following mitigating circumstances: that defendant's I.Q. of eighty-one placed him in the lowest ten

percent of the population; that defendant was a model prisoner in jail while awaiting trial; that defendant was a person of good behavior except when he was drinking alcohol; and the catch-all exception of "any other circumstance or circumstances which you the jury deem to have mitigating value."[2]

Defendant characterizes this crime as a robbery-murder. He argues that because this Court vacated the death sentence in *State v. Young*, 312 N.C. 669, 325 S.E. 2d 181 (1985), it is bound to do the same in his case. In *Young* the nineteen-year-old defendant, along with two companions, went to the victim's house intending to rob and murder the victim. Defendant stabbed the victim in the chest twice, then handed the knife to his companion, ordering the companion to "finish him." The companion stabbed the victim several more times. The three perpetrators then stole the victim's money and coin collection and fled.

The jury in *Young* found as aggravating circumstances that the murder was committed while defendant was engaged in the commission of armed robbery and that it was committed for pecuniary gain. N.C.G.S. § 15A-2000(e)(5), (6) (1988). At that time, we counted twenty-eight robbery-murder cases in the pool and noted that in twenty-three of those cases juries imposed sentences of life imprisonment rather than death. *Young*, 312 N.C. at 687, 325 S.E. 2d at 192. We then stated:

> While we wish to make it *abundantly clear* that we do not consider this numerical disparity dispositive of our proportionality review, our careful examination of these cases has led us to the conclusion that although the crime here committed was a tragic killing, "it does not rise to the level of

2. Defendant submitted, and the jury refused to find, the following mitigating circumstances:

1. Was this murder committed while the defendant was under the influence of mental or emotional disturbance? (Answer: No, not unanimous.)

2. Was the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law impaired? (Answer: No—The jury was unanimous—[illegible] his capacity was not impaired.

. . .

6. Did the defendant have a good relationship with the deceased prior to May 1, 1986? (No, not unanimous.)

those murders in which we have approved the death sentence upon proportionality review." . . . The facts presented by this appeal more closely resemble those cases in which the jury recommended life imprisonment than those in which the defendant was sentenced to death.

*Id.* at 688, 325 S.E. 2d at 193 (quoting *State v. Jackson,* 309 N.C. 26, 46, 305 S.E. 2d 703, 717 (1983) (emphasis in original) ).

In addition to *Young,* defendant cites the following robbery-murder cases in which juries recommended life sentences: *State v. Penley,* 318 N.C. 30, 347 S.E. 2d 783 (1986); *State v. Sumpter,* 318 N.C. 102, 347 S.E. 2d 396 (1986); *State v. Murray,* 310 N.C. 541, 313 S.E. 2d 523 (1984). Defendant calls our attention to *State v. Stokes,* 319 N.C. 1, 352 S.E. 2d 653 (1987), the companion case to *Murray,* in which defendant Murray's codefendant, Stokes, was sentenced to death. This Court vacated the Stokes sentence, relying in part on the fact that Stokes' codefendant, Murray, received a life sentence for the same crime.

We repeat our warning in *Young* that numerical disparity is not dispositive on proportionality review. Our conclusion that the death sentence in *Young* was disproportionate was based on the finding that the murder did not rise to the level of the crimes committed in death-affirmed cases, not on mere numerical disproportion. We also note that many of the robbery-murder cases included in defendant's brief are pure felony-murder cases. The jury in the present case also found premeditation and deliberation on defendant's part. While the *Penley* and *Sumpter* juries found premeditation and deliberation by defendants there, the *Stokes* and *Murray* juries did not.

In addition, the defendants in *Young, Murray,* and *Stokes* were considerably younger than the thirty-seven-year-old defendant in this case. Young was nineteen, Stokes was seventeen, and Murray was in his "early twenties."

None of the above-cited cases involved a victim related to the defendant. That fact alone distinguishes the present case from the standard robbery-murder case involving an unknown victim or casual acquaintance. In the final analysis, the present case is distinguishable from other robbery-murder cases primarily because the victim was defendant's father. This relationship be-

tween defendant and victim "in itself rendered the offense dehumanizing beyond the normal." *State v. Blalock*, 77 N.C. App. 201, 205, 334 S.E. 2d 441, 444 (1985) (Fair Sentencing Act case wherein father assaulted son). Our research reveals no other case in the pool with similar facts. Defendant beat the victim to death to steal his money and secure an inheritance. The victim was in a position of enhanced vulnerability because the victim and defendant were closely related, defendant lived nearby, the two frequently spent time together, and the victim thus had no reason to be on guard against harm at defendant's hand. Defendant told Ms. Hopson, and she testified, that the victim had his back to defendant when defendant struck him in the head with the shotgun, saying, "You done me wrong, you son of a bitch." The pathologist testified that the blow to the head was the cause of death. Thus, defendant killed his father for a pecuniary motive while his father had his back turned. The evidence showed that defendant inflicted further blows on the victim, then dragged the body to the stairs, attempting to make the murder look like an accident. These actions show a meanness on the part of a mature, calculating adult without remorse for his crime or mercy towards his victim.

Defendant attempts to portray his case as a typical robbery-murder. We disagree with this characterization; the crime is more accurately described as a premeditated and deliberated robbery-murder of a parent by a child, executed by a brutal beating until death resulted. The pool contains few cases involving the murder of a parent. In *State v. Clark*, 300 N.C. 116, 265 S.E. 2d 204 (1980), defendant stabbed his father to death. The jury recommended life imprisonment. However, there a psychiatrist testified that defendant might have committed the murder while suffering from a psychotic break. In addition, several witnesses testified regarding defendant's unusual behavior. Finally, defendant testified that he was an F.B.I. agent with badge number zero, that he was born in Africa on "the first year, the first day, the first month, three-one-one-one," and that he had come to investigate the stabbing of his "son." Further testimony by defendant was equally bizarre. Thus, the substantial evidence of insanity there distinguishes *Clark* from the present case.

We next compare this case to others in which this Court has affirmed a sentence of death, in order to determine whether this

case "rise[s] to the level of those murders in which we have approved the death sentence upon proportionality review." *State v. Jackson*, 309 N.C. at 46, 305 S.E. 2d at 717. Defendant maintains that the death penalty is disproportionate in this regard, emphasizing that this penalty has never been imposed in North Carolina in a case in which the only aggravating circumstance was that the murder was committed while the defendant was engaged in the commission of an armed robbery. We rejected a similar argument in *State v. Zuniga*, 320 N.C. 233, 357 S.E. 2d 898, *cert. denied*, --- U.S. ---, 98 L.Ed. 2d 384 (1987). In that case, defendant argued that the death penalty was disproportionate because the single aggravating circumstance of an accompanying felony was submitted to the jury. We stated that "a single aggravating factor may outweigh a number of mitigating factors and may be sufficient to support a death sentence." *Id.* at 274, 357 S.E. 2d at 923. The present case required the jury to weigh one statutory aggravating circumstance against three nonstatutory mitigating circumstances and the statutory "catch-all" circumstance. We consistently have rejected a "mechanical[,] mathematical approach" to weighing aggravating and mitigating circumstances. *State v. McDougall*, 308 N.C. at 32, 301 S.E. 2d at 326. We cannot say as a matter of law that the jury recommended a disproportionate sentence merely because the sentence was based on a single aggravating circumstance.

Defendant argues that one of three aggravating circumstances is almost always present in North Carolina cases in which the jury recommends a death sentence and this Court affirms the death sentence on appeal. These three circumstances are:

(1) The defendant had been previously convicted of a felony involving the use or threat of violence to the person. N.C.G.S. § 15A-2000(e)(3) (1988).

(2) The capital felony was especially heinous, atrocious or cruel. N.C.G.S. § 15A-2000(e)(9) (1988).

(3) The murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons. N.C.G.S. § 15A-2000(e)(11) (1988).

---

State v. Greene

---

Defendant states that in the thirty "death-affirmed" cases in the pool, juries found at least one of the above three aggravating circumstances in twenty-nine cases.[3] The exception was *Zuniga,*

3. In eight of the thirty cases, the jury found that the defendant previously had been convicted of a violent felony. *State v. Green,* 321 N.C. 594, 365 S.E. 2d 587, *cert. denied,* --- U.S. ---, 102 L.Ed. 2d 235 (1988); *State v. Holden,* 321 N.C. 125, 362 S.E. 2d 513 (1987), *cert. denied,* --- U.S. ---, 100 L.Ed. 2d 935 (1988); *State v. Brown,* 320 N.C. 179, 358 S.E. 2d 1, *cert. denied,* --- U.S. ---, 98 L.Ed. 2d 406 (1987); *State v. Robbins,* 319 N.C. 465, 356 S.E. 2d 279, *cert. denied,* --- U.S. ---, 98 L.Ed. 2d 226 (1987); *State v. Brown,* 315 N.C. 40, 337 S.E. 2d 808 (1985), *cert. denied,* 476 U.S. 1165, 90 L.Ed. 2d 733 (1986); *State v. Boyd,* 311 N.C. 408, 319 S.E. 2d 189 (1984), *cert. denied,* 471 U.S. 1030, 85 L.Ed. 2d 324 (1985); *State v. McDougall,* 308 N.C. 1, 301 S.E. 2d 308, *cert. denied,* 464 U.S. 865, 78 L.Ed. 2d 173 (1983); *State v. Taylor,* 304 N.C. 249, 283 S.E. 2d 761 (1981), *cert. denied,* 463 U.S. 1213, 77 L.Ed. 2d 1398, *reh'g denied,* 463 U.S. 1249, 77 L.Ed. 2d 1456 (1983). In seventeen of the thirty cases, the jury found that the murder was especially heinous, atrocious, or cruel. *State v. Lloyd,* 321 N.C. 301, 364 S.E. 2d 316, *judgment vacated and remanded,* --- U.S. ---, 102 L.Ed. 2d 18, *judgment reinstated,* 323 N.C. 622, 374 S.E. 2d 277 (1988); *State v. Spruill,* 320 N.C. 688, 360 S.E. 2d 667 (1987), *cert. denied,* --- U.S. ---, 100 L.Ed. 2d 934 (1988); *State v. Gladden,* 315 N.C. 398, 340 S.E. 2d 673, *cert. denied,* 479 U.S. 871, 93 L.Ed. 2d 166 (1986); *Brown,* 315 N.C. 40, 337 S.E. 2d 808; *State v. Huffstetler,* 312 N.C. 92, 322 S.E. 2d 110 (1984), *cert. denied,* 471 U.S. 1009, 85 L.Ed. 2d 169 (1985); *Boyd,* 311 N.C. 408, 319 S.E. 2d 189; *State v. Maynard,* 311 N.C. 1, 316 S.E. 2d 197, *cert. denied,* 469 U.S. 963, 83 L.Ed. 2d 299 (1984); *State v. Oliver,* 309 N.C. 326, 307 S.E. 2d 304 (1983); *State v. Craig and State v. Anthony,* 308 N.C. 446, 302 S.E. 2d 740, *cert. denied,* 464 U.S. 908, 78 L.Ed. 2d 247 (1983); *State v. Williams,* 308 N.C. 47, 301 S.E. 2d 335, *cert. denied,* 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied,* 464 U.S. 1004, 78 L.Ed. 2d 704 (1983); *McDougall,* 308 N.C. 1, 301 S.E. 2d 308; *State v. Brown,* 306 N.C. 151, 293 S.E. 2d 569, *cert. denied,* 459 U.S. 1080, 74 L.Ed. 2d 642 (1982); *State v. Pinch,* 306 N.C. 1, 292 S.E. 2d 203, *cert. denied,* 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied,* 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983); *State v. Smith,* 305 N.C. 691, 292 S.E. 2d 264, *cert. denied,* 459 U.S. 1056, 74 L.Ed. 2d 622 (1982); *State v. Rook,* 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied,* 455 U.S. 1038, 72 L.Ed. 2d 155 (1982); *State v. Martin,* 303 N.C. 246, 278 S.E. 2d 214, *cert. denied,* 454 U.S. 933, 70 L.Ed. 2d 240, *reh'g denied,* 454 U.S. 1117, 70 L.Ed. 2d 655 (1981); *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied,* 448 U.S. 907, 65 L.Ed. 2d 1137, *reh'g denied,* 448 U.S. 918, 65 L.Ed. 2d 1181 (1980). In eleven of the cases, the jury found that the murder was part of a course of conduct in which the defendant committed a violent crime against another person. *Green,* 321 N.C. 594, 365 S.E. 2d 587; *State v. Vereen,* 312 N.C. 499, 324 S.E. 2d 250, *cert. denied,* 471 U.S. 1094, 85 L.Ed. 2d 526 (1985); *State v. Noland,* 312 N.C. 1, 320 S.E. 2d 642 (1984), *cert. denied,* 469 U.S. 1230, 84 L.Ed. 2d 369, *reh'g denied,* 471 U.S. 1050, 85 L.Ed. 2d 342 (1985); *State v. Gardner,* 311 N.C. 489, 319 S.E. 2d 591 (1984), *cert. denied,* 469 U.S. 1230, 84 L.Ed. 2d 369 (1985); *State v. Lawson,* 310 N.C. 632, 314 S.E. 2d 493 (1984), *cert. denied,* 471 U.S. 1120, 86 L.Ed. 2d 267 (1985); *Craig and Anthony,* 308 N.C. 446, 302 S.E. 2d 740; *McDougall,* 308 N.C. 1, 301 S.E. 2d 308; *Brown,* 306 N.C. 151, 293 S.E. 2d 569; *Pinch,* 306 N.C. 1, 292 S.E. 2d 203; *State v. Williams,* 305 N.C. 656, 292 S.E. 2d 243, *cert. denied,* 459 U.S. 1056, 74 L.Ed. 2d 622 (1982); *State v. Hutchins,* 303 N.C. 321, 279 S.E. 2d 788 (1981); *cert. denied,* 464 U.S. 1065, 79 L.Ed. 2d 207 (1984). In his

which involved the rape and murder of a seven-year-old girl.[4] Since defendant submitted his brief, seven death-affirmed cases have been added to the pool. These additional cases support defendant's observation regarding the prevalence of these three aggravating circumstances.[5]

We recognize that certain aggravating circumstances usually are present in death-affirmed cases, but we do not consider their presence crucial to affirmation of a jury's recommendation of a death sentence. *See State v. Brown,* 320 N.C. 179, 230, 358 S.E. 2d 1, 33 (not all death-affirmed cases involve a finding of heinous, atrocious, or cruel murder), *cert. denied,* --- U.S. ---, 98 L.Ed. 2d 406 (1987). While comparison of the relevant aggravating circumstance(s) provides an important method for comparative proportionality review, our capital sentencing statute directs us to consider whether the death sentence in a given case is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2) (1988). Our review of the sentence is therefore not so

---

brief, defendant included a thirtieth case, *State v. McDowell,* 301 N.C. 279, 271 S.E. 2d 286 (1980), *cert. denied,* 450 U.S. 1025, 68 L.Ed. 2d 220, *reh'g denied,* 451 U.S. 1012, 68 L.Ed. 2d 865 (1981), in which the jury found all three of these aggravating circumstances. Because the United States Court of Appeals for the Fourth Circuit has ordered release of the defendant there on habeas corpus unless he is retried within a reasonable time to be set by the federal district court, *McDowell v. Dixon,* 858 F. 2d 945 (4th Cir. 1988), this case has been eliminated from the pool.

4. The only aggravating circumstance submitted to the jury in *Zuniga* was commission of the murder while defendant was engaged in an accompanying felony. N.C.G.S. § 15A-2000(e)(5) (1988).

5. *See State v. Hunt and Barnes,* 323 N.C. 407, 373 S.E. 2d 400 (1988) (prior violent felony or prior capital felony); *State v. Fullwood,* 323 N.C. 371, 373 S.E. 2d 518 (1988) (heinous, atrocious, or cruel); *State v. Allen,* 323 N.C. 208, 372 S.E. 2d 855 (1988) (course of conduct); *State v. Cummings,* 323 N.C. 181, 372 S.E. 2d 541 (1988) (prior capital offense); *State v. McLaughlin,* 323 N.C. 68, 372 S.E. 2d 49 (1988) (heinous, atrocious, or cruel); *State v. McKoy,* 323 N.C. 1, 372 S.E. 2d 12 (1988) (prior violent felony); and *State v. Lloyd,* 321 N.C. 301, 364 S.E. 2d 316 (heinous, atrocious, or cruel), *judgment vacated and remanded,* --- U.S. ---, 102 L.Ed. 2d 18 (1988), *judgment reinstated,* 323 N.C. 622, 374 S.E. 2d 277 (1988). We note that *Hunt and Barnes* and *Cummings* involve prior capital offenses rather than prior violent felonies, but consider the two aggravating circumstances to be sufficiently analogous for purposes of this discussion, as both circumstances "reflect upon the defendant's character as a recidivist." *State v. Brown,* 320 N.C. 179, 224, 358 S.E. 2d 1, 30, *cert. denied,* --- U.S. ---, 98 L.Ed. 2d 406 (1987).

cursory as considering only cases involving identical aggravating circumstances. Rather, our task is more complicated, as it involves examining both the crime and the defendant.

Although none of the death-affirmed cases involve circumstances similar to defendant's case, we nonetheless conclude that this case does rise to the level of certain other death-affirmed cases. In *State v. Huffstetler*, 312 N.C. 92, 322 S.E. 2d 110 (1984), *cert. denied*, 471 U.S. 1009, 85 L.Ed. 2d 169 (1985), the defendant beat his sixty-five-year-old mother-in-law to death with an iron skillet. The attack on the victim there essentially was unprovoked, as was the attack on this defendant's victim. Neither victim had reason to guard against aggression by either defendant, as the defendant was well known to the victim in both cases. Both victims were beaten to death. The jury did find the murder in *Huffstetler* to be especially heinous, atrocious, or cruel, a factor rejected by the jury here. However, the jury in *Huffstetler* found that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. This statutory mitigating circumstance was rejected by the jury here. Thus, the assault in *Huffstetler* may have been more brutal, but the defendant there may have been less culpable. We declined to overrule the jury's recommendation of death in *Huffstetler*, and we decline to do so here.

In *Brown*, the defendant shot the victim in the head after lying in wait outside the victim's home. *Brown*, 320 N.C. 179, 358 S.E. 2d 1. We recognized in *Brown* the special status of the home, and stated that the murder there "shocks the conscience, not only because a life was senselessly taken, but because it was taken by the surreptitious invasion of an especially private place, one in which a person has a right to feel secure." *Id.* at 231, 358 S.E. 2d at 34. Perhaps at no time does a person feel safer and more secure than when in his or her home with a family member. By murdering his father in his "castle," defendant violated not only the bonds of family, but the sanctity the law accords to the victim's abode.

Like the defendant in *Brown*, defendant displayed no remorse for his act. He pretended to join his family in grieving for his father, but threatened to kill Ms. Hopson if she ever told anyone of his responsibility for the murder. *Cf. State v. Bon-*

*durant,* 309 N.C. 674, 694, 309 S.E. 2d 170, 182-83 (1983) (defendant's remorse and concern for victim's life immediately following the shooting a significant factor in Court's vacating death sentence as disproportionate). Another similarity between this case and *Brown* was the lack of opportunity for the victim to defend himself. Defendant hit his father over the head while his back was turned. "Unlike the victim felled in a face-to-face confrontation, this victim had no chance to fight for his life." *Brown,* 320 N.C. at 232, 358 S.E. 2d at 34. These cases parallel one another in the cowardly nature of the assaults.

The defendant in *State v. Lloyd,* 321 N.C. 301, 364 S.E. 2d 316, *judgment vacated and remanded,* --- U.S. ---, 102 L.Ed. 2d 18, *judgment reinstated,* 323 N.C. 622, 374 S.E. 2d 277 (1988), murdered and robbed his former employer. The victim was beaten and stabbed to death; his body had thirty-six wounds. The jury returned a verdict of guilty of first degree murder based on both felony murder and premeditation and deliberation. Aggravating circumstances found by the jury included especially heinous, atrocious, or cruel and commission during an armed robbery. Except for the especially heinous nature of the assault in *Lloyd,* the crime there and the crime here bear some resemblance. Both involved a premeditated robbery-murder by an assailant known to the victim. In addition, the mitigating circumstances found by the respective juries are somewhat similar. The *Lloyd* jury found four mitigating circumstances: (1) since his arrest, defendant had shown no tendencies of violence toward others; (2) since his arrest, defendant had abided by the rules and regulations of the jail; (3) defendant had adapted well to life as a prisoner; and (4) defendant had suffered from episodic alcohol abuse since 1973. Two of these circumstances reflect on defendant Lloyd's behavior in jail; one of the mitigating circumstances found by the jury in defendant's case was that defendant had been a model prisoner in jail while awaiting trial. Defendant Lloyd was found to suffer from episodic alcohol abuse; defendant in the present case was found to be a person of good behavior except when he was drinking alcohol. The juries in both cases concluded the mitigating circumstances were insufficient to outweigh the aggravating circumstances. We did not find the penalty imposed disproportionate in *Lloyd,* and neither do we so find here.

Having compared this case to other death-affirmed cases, "[w]e cannot say that it does not fall within the class of first

degree murders in which we have previously upheld the death penalty." *State v. Brown,* 315 N.C. 40, 71, 337 S.E. 2d 808, 830 (1985), *cert. denied,* 476 U.S. 1165, 90 L.Ed. 2d 733 (1986). We find no error in the guilt or sentencing phases of defendant's trial. Considering the pool cases, the crime, and the defendant, we cannot hold as a matter of law that the death sentence was disproportionate or excessive. We thus decline to set aside the penalty recommended by the jury, to which "great deference should be accorded." *State v. Goodman,* 298 N.C. at 35, 257 S.E. 2d at 591.

No error.

Chief Justice EXUM concurring.

I concur with the majority's treatment of all issues in the guilt and sentencing phases of this trial.

If in the sentencing phase the Court were addressing for the first time the mitigating circumstance unanimity instruction issue, I would agree with defendant's position that these instructions violate the Eighth Amendment to the federal constitution as that amendment was interpreted in *Mills v. Maryland,* 486 U.S. ---, 100 L.Ed. 2d 384 (1988), for the reasons stated in my dissenting opinions in *State v. McKoy,* 323 N.C. 1, 372 S.E. 2d 12 (1988), and *State v. Allen,* 323 N.C. 208, 372 S.E. 2d 855 (1988). The majority's position on this issue is, as a result of the Court's decisions in *McKoy* and *Allen,* the law of this state to which I am now bound. For this reason I concur with the majority's treatment of this issue.

Justice FRYE dissenting as to sentence.

I agree with the majority that the guilt phase of defendant's trial was free of prejudicial error. In view of the decision of the United States Supreme Court in *Mills v. Maryland,* 486 U.S. ---, 100 L.Ed. 2d 384 (1988), and the action of that Court in remanding to this Court our decision in *State v. Lloyd,* 321 N.C. 301, 364 S.E. 2d 316 (1988), *vacated sub nom. Oscar Lloyd v. North Carolina,* --- U.S. ---, 102 L.Ed. 2d 18 (1988), *mandate reinstated by order, State v. Lloyd,* 323 N.C. 622, 374 S.E. 2d 277 (1988) (Exum, C.J., and Frye, J., dissenting), for consideration in light of *Mills,* I cannot join the majority's conclusion that the sentencing phase of

defendant's trial was free of prejudicial error. While in some cases we have to speculate as to whether the jurors' decision not to find a particular mitigating circumstance is unanimous, we have no such question in this case. As the majority notes, in answer to the question, "Was this murder committed while the defendant was under the influence of mental or emotional disturbance?" the jury responded, "No, not unanimous." Although some of the jurors were willing to find that the murder was committed while the defendant was under the influence of mental or emotional disturbance, they were not permitted to consider this mitigating circumstance in the final weighing process to determine whether defendant should live or die as the punishment for the crime he committed. This alone, in my opinion, brings the case within the ambit of *Mills*. Accordingly, I vote to give defendant a new sentencing hearing.