STATE OF NORTH CAROLINA v. OTTO WITHERS, JR.

(Filed 20 September, 1967.)

**1. Criminal Law § 111—**

It is not required that the court in its charge inform the jury as to who had made or brought the charges against defendant, it being sufficient that the indictment against defendant had been duly returned by the grand jury.

**2. Criminal Law § 112—**

The charge to the effect that reasonable doubt was not an imaginary or fanciful doubt but was a sane, rational doubt arising out of the evidence or lack of it, so that the evidence fails to satisfy or convince the jurors of defendant's guilt, *held* not prejudicial, it not being required that the court use any set formula in defining reasonable doubt.

**3. Homicide § 22—**

The court's definition of murder in the first degree, second degree, and manslaughter *held* without error in this case.

**4. Criminal Law § 168—**

A *lapsus linguæ* in the charge, immediately corrected by the court so that the jury could not have been misled, will not be held for prejudicial error.

**5. Homicide § 27—**

The court's definition of homicide by misadventure *held* not prejudicial to defendant in this case.

**6. Criminal Law § 166—**

Exceptions not brought forward in the brief and supported by reason or argument are deemed abandoned. Rule of Practice in the Supreme Court No. 28.

APPEAL by defendant from *McLaughlin, J.,* 5 December 1966, Conflict Criminal "C" Term of MECKLENBURG Superior Court.

The defendant was charged in a bill of indictment with the first degree murder of his sister-in-law, Rachael Simpson, on 5 August 1966. He was represented by court-appointed counsel who entered a plea of not guilty. The jury returned a verdict of guilty of murder in the first degree with a recommendation of life imprisonment, and from the judgment the defendant appealed.

The State's evidence tended to show that the defendant and his wife, Annie Bell Withers, were estranged and that she had returned to the home of her mother where the deceased Rachael Simpson also lived. Another sister, Helen Simpson, said that the defendant came to the house sometime before lunch and that when she opened the front door in response to a little boy's knock that Otto jumped from behind the bushes, grabbed her, pulled out his pistol and asked her where his wife was, saying "I came here to kill and you are go-

ing to stay here until the rest of your family comes home, and I'm going to kill all of you." He then forced Helen into the house, locked the doors and windows and again said that he was going to stay there until everybody came home and was going to kill all of them. He kept Helen a captive all day long. Meanwhile, he stabbed her and raped her at the point of the gun. During the afternoon, the defendant phoned his brother to tell him to bring him some bullets "because I don't have enough bullets to kill everybody." Later, his brother, Jerry, came to the house, and Otto sent him out to get "$3.00 worth of bullets." Jerry returned with a little brown bag and gave it to Otto, who put it in his pocket. He took something out of it and put it in the gun. Rachael was the first in the family to get home, and later other members returned. When they came to the door Otto pointed the pistol at them and told them if they didn't come in he would kill them. Upon coming into the house he said "I'm going to kill all of you," and he snapped the pistol twice but it didn't go off, and he dropped something on the floor. When he went to get it, the others started running, leaving Rachael sitting in a chair by the window. As she went out the door, Helen heard three shots. The police were called, and upon their arrival found Rachael sitting in a chair, dead.

In addition, the State offered the testimony of Carolyn Blocker, cousin of the deceased, Evangeline Simpson, the mother of the deceased, Beatrice Carter, aunt of the deceased, and Alvin Simpson, a six-year old boy and nephew of the deceased. Their testimony in summary was that upon arriving at the house the defendant met them at the door with the pistol in his hand, told them that he had raped and stabbed Helen, that he was going to kill them all, that Helen was bleeding and they saw her bloody clothes. A few minutes later, he dropped something on the floor; and as he was reaching to get it, all of them left the house except Rachael and Alvin. They heard three shots fired and then called the police. Alvin testified that after the others ran out of the house. Otto "Went to the window and looked out the window to see was the police coming. After that he shot and ran. He shot Rachael — that's all he shot."

W. J. Edwards of the Charlotte Police Department testified that he had studied different phases of police investigation — criminology, photographing, and fingerprinting. When he arrived at the scene Rachael was "still in the chair" and was dead. He found three spent 9 millimeter cartridges, casings, near the place where Rachael was found and what appeared to be a bullet hole ripped in the inside facing of the front door. On top of the washing machine was

a mass of stained clothing. All of the above articles were offered in evidence.

The coroner testified that he saw Rachael's body at her home and later at the funeral home, that he examined the body at both places and found that she was dead. There were two bullet wounds in her right arm, one between the seventh and eighth rib on the right side and one between the second and third rib "slightly to the left of the sternum, that is the breast bone." He gave it as his opinion that she died from multiple gunshot wounds, particularly in the chest, from hemorrhaging.

The defendant testified that his wife had had him arrested, and he had gone to her mother's home to see if he could get her to drop the charges so that he would not lose his job or his house. That his wife and his mother-in-law had both previously threatened him and that he took the gun for his protection. When he arrived at the house he saw Helen, whom he thought at the time to be his wife, kissing a man, and that he hid in some bushes until the man left. He then went into the house and told Helen he wanted to stay there until his wife returned. He denied making any threats or raping Helen. He said Helen tried to stab him in the back with a little knife, that he twisted her arm behind her back, that they tussled and fell back on the floor, and he then saw blood on her back and told her she had been cut. He took a wet towel and tried to wipe the wound out until it stopped bleeding and put mercurochrome, bandaids and adhesive tape over the nick. He then wet a rag and wiped up all of the blood off the floor. He denied that he ever drew a revolver on her but said he pulled out his unloaded revolver when Evangeline and Beatrice came to the house. He later dropped the clip on the floor, at which time Helen and Evangeline ran from the house. He put the clip back in his gun and then Rachael jumped up and slapped him and snatched the pistol. They were scuffling with it and it fired twice. Rachael fell back "and she was hollering. I don't know what she was hollering. I don't know where she was shot. I don't know what happened — the only thing I know is we were tussling with the gun and the gun went off." He got excited, ran to the door, tried to open it, and the gun went off again. He ran out of the house, laid the pistol in some shrubbery, hired a car to take him to Salisbury and then went by bus to Baltimore where he stayed about three weeks or a month. Upon his return home, he was arrested. He denied calling his brother Jerry to get more bullets for him, and Jerry testified that he was not called and that he did not go to the house that afternoon as Helen had claimed.

When the case on appeal was being prepared, the court reporter

was ill and unable to transcribe his notes. Someone else attempted to transcribe them and his version of the charge was included in the case on appeal. Not being familiar with the reporter's symbols and abbreviations, several errors were made in transcribing the notes. The attorney for the defendant and the solicitor agreed that upon the recovery of the court reporter he should transcribe his notes correctly, which was done, and the correct version was filed as an addendum to the case on appeal by proper agreement and stipulation. Later, a second addendum was filed for the defendant, but it appeared irrelevant in view of the corrected charge, and it has been withdrawn upon motion of the Attorney General, to which the defendant has consented.

No exceptions were taken to the evidence. Exceptions were taken to the corrected charge which are considered in the opinion.

*W. B. Nivens, Attorney for the defendant appellant.*
*T. W. Bruton, Attorney General, and James F. Bullock, Deputy Attorney General, for the State.*

PLESS, J. The defendant complains that the judge did not inform the jury "who, what jury, and under what circumstances these charges were made." The judge began his charge with the statement, "(T)he State of North Carolina charges in this bill of indictment," etc. The defendant contends that the jury was left in a state of doubt as to who made or brought these charges against this defendant. Having been indicted by a grand jury, this was irrelevant, and the contention is without merit.

The defendant further claims that the court committed prejudicial error in the following statements:

> "Now, a reasonable doubt is not an imaginary or fanciful doubt, members of the jury, but a sane, rational doubt that arises out of the evidence or lack of evidence, or some deficiency in it." DEFENDANT'S EXCEPTION No. 7 (R. p. 78) (Addendum, p. 4).

> "A reasonable doubt is a term — as that term is employed in the administration of the criminal law is an honest, substantial misgiving generated by some insufficiency of the proof, an insufficiency which fails to convince your mind and judgment, and satisfy your reasoning of the defendant's guilt." DEFENDANT'S EXCEPTION No. 8 (R. p. 78) (Addendum, p. 5).

These statements are in substantial accord with the definitions approved by the court. *S. v. Hammonds,* 241 N.C. 226, 85 S.E. 2d 133; *State v. Steele,* 190 N.C. 506, 130 S.E. 308. In *Hammonds,*

*supra,* the court said, "The law does not require any set formula in defining reasonable doubt"; and we can see no prejudice to the defendant in the above definitions.

Another exception is to the following excerpts from the charge:

> "It will be obvious to you that the distinction between murder in the first degree and murder in the second degree is the presence of premeditation and deliberation in murder in the first degree and the absence of premeditation and deliberation in murder in the second degree . . . in the second degree, members of the jury. In other words, to convict of murder in the first degree, it will be essential that the State should satisfy you beyond a reasonable doubt that the defendant killed the deceased with malice, and with premeditation and deliberation." DEFENDANT'S EXCEPTION No. 14 (R. p. 81) (Addendum, p. 7).

> "So you will observe that the distinction between murder in the second degree and manslaughter is the presence of malice in murder in the second degree, and its absence in manslaughter." DEFENDANT'S EXCEPTION No. 15 (R. p. 81) (Addendum, p. 7).

There the court was explaining the differences between murder in the first degree and murder in the second degree, and manslaughter and murder in the second degree. The instructions are entirely correct as supported by our decisions in many cases. In *S. v. Downey,* 253 N.C. 348, 117 S.E. 2d 39, Winborne, C.J., succinctly summarized the degrees of murder:

> "(1) Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation. (2) Murder in the second degree is the unlawful killing of a human being with malice, but without premeditation and deliberation. And (3) manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation."

The given instructions are in accord.

The final group of exceptions relate to the part of the charge in which the judge was defining a misadventure. He said:

> "It is an intentional — uh — it is an unintentional killing in which the perpetrator had no wrong purpose in doing the act which caused the death; done accidentally and not negligently; while he was engaged in no unlawful act. In other words, misadventure, when applied to homicide, is the act of a man who, in the performance of a lawful act without any intention to do harm, and using proper precaution to avoid danger, unfortunately kills another." DEFENDANT'S EXCEPTION No. 17 (R. p. 85) (Addendum, p. 10).

While it appears that the judge used the word "intentional" at the beginning of the statement, it is quite clear that he immediately corrected himself by saying "it is an unintentional killing."

The above quotation is a correct statement of the law of killing by misadventure. In 26 Am. Jur., Homicide, § 220, p. 305, it is said: "Where it appears that a killing was unintentional, that the perpetrator acted with no wrongful purpose in doing the homicidal act, that it was done while he was engaged in a lawful enterprise, and that it was not the result of negligence, the homicide will be excused on the score of the accident." This is quoted by Sharpe, J., speaking for the Court in *S. v. Phillips,* 264 N.C. 508, 142 S.E. 2d 337. See also 40 C.J.S., Homicide § 112b, p. 980.

The instruction given was more than the defendant was entitled to receive. It could not be seriously contended that the defendant was "in the performance of a lawful act without any intention to do harm." Four witnesses testified that he had gone to his mother-in-law's home with his pistol and that he had threatened to kill everybody in the house. And while he denied the threats, he did admit that he had gone there with a pistol, with bullets for it, and had remained there awaiting the return of his wife for at least six or seven hours.

The defendant had other exceptions, but they were not brought forward in the brief, and no reason or argument is stated and no authority cited in support of them. They are thus deemed abandoned. Rule 28, Rules of Practice in the Supreme Court, 254 N.C. 810, and 1 Strong, N. C. Index, Appeal and Error § 38.

It appears that the defendant has had a fair trial.

No error.