STATE OF NORTH CAROLINA v. CLAUDE DAVID TURNER, JR.

No. 587A88

(Filed 6 December 1991)

1. **Evidence and Witnesses § 2993 (NCI4th)— void prior convictions—use for impeachment—harmless error**

Assuming *arguendo* that defendant's prior convictions are void because he pled guilty to offenses with which he was not charged and that defense counsels' affidavit concerning their examination of court records was sufficient evidence to prove that fact, any error in allowing the prosecutor to impeach defendant with the prior void convictions in this prosecution for first degree murder was harmless beyond a reasonable doubt where the evidence of defendant's responsibility for the victim's death was overwhelming and uncontested, and it is

STATE v. TURNER

[330 N.C. 249 (1991)]

beyond doubt that the jury rejected defendant's defense of accident based on the strength of the State's case and not on the improper impeachment.

**Am Jur 2d, Witnesses §§ 570, 576, 582, 586.**

**2. Homicide § 24.1 (NCI3d) — presumptions from use of deadly weapon — omission of "intentional" in instructions — harmless error**

While it was error for the trial court in a first degree murder case to omit the word "intentionally" before the word "killed" in its instructions permitting the jury to infer unlawfulness and malice from proof "that the defendant killed [the victim] with a deadly weapon," this omission was harmless beyond a reasonable doubt where the court's instructions, taken as a whole, made it clear to the jury that it must find that defendant intentionally used a shotgun to cause the victim's death in order to find defendant guilty of first degree murder; the court's instructions required the jury to find unanimously and beyond a reasonable doubt that the shooting was not accidental in order to return a guilty verdict; and by finding defendant guilty of first degree murder, the jury rejected the defense of accident and, in fact, concluded that defendant's acts were intentional.

**Am Jur 2d, Homicide §§ 498, 499, 509.**

**3. Homicide § 24.1 (NCI3d) — instruction — shotgun as deadly weapon**

The trial court's instruction in a first degree murder case that "a sawed-off shotgun is a deadly weapon" was proper where defendant contended that the shooting was accidental but the jury, in fact, concluded that defendant intentionally caused the death of the victim through the use of the loaded shotgun.

**Am Jur 2d, Homicide § 509.**

**4. Criminal Law § 537 (NCI4th) — emotional behavior of victim's family — no denial of fair trial**

The trial court did not abuse its discretion by its actions, or inaction, with regard to emotional behavior by a murder victim's family and friends during defendant's trial for the murder where the court attempted to ameliorate prejudice

to defendant by having the witnesses moved out of the bar area and into the spectator area; the court left control of the family's behavior to the prosecuting attorney; and defendant never objected to the emotional displays, requested curative instructions, or moved for a mistrial.

Am Jur 2d, Criminal Law § 878; New Trial § 42; Trial §§ 205, 226.

Emotional manifestations by victim or family of victim during criminal trial as ground for reversal or new trial. 31 ALR4th 229.

5. **Criminal Law § 1352 (NCI4th) — McKoy error — new sentencing hearing**

A defendant sentenced to death for first degree murder is entitled to a new sentencing hearing because of *McKoy* error in the trial court's instructions requiring unanimity for mitigating circumstances where there was evidence supporting four mitigating circumstances submitted to but not found unanimously by the jury.

Am Jur 2d, Criminal Law § 600; Homicide § 548; Trial § 1760.

Unanimity as to punishment in criminal case where jury can recommend lesser penalty. 1 ALR3d 1461.

6. **Criminal Law § 1355 (NCI4th) — mitigating circumstance — no significant history of criminal activity — sufficiency of evidence**

A reasonable juror in this first degree murder trial could have found as a mitigating circumstance that defendant had no significant history of prior criminal activity where evidence of defendant's adjudicated criminal activity consisted solely of the misdemeanor offenses of receiving stolen goods in 1981, larceny in 1984, and worthless check and assault with a deadly weapon in 1985; and evidence of defendant's unadjudicated criminal activity consisted of possession of marijuana and theft when defendant was a juvenile, the sale of marijuana to the victim which ultimately led to the fatal altercation, and possession of a sawed-off shotgun.

Am Jur 2d, Criminal Law §§ 598, 599; Homicide §§ 553, 554.

STATE v. TURNER

[330 N.C. 249 (1991)]

7. **Criminal Law § 1362 (NCI4th) — mitigating circumstance — age of defendant**

A reasonable juror could have found defendant's age as a mitigating circumstance for first degree murder where the evidence showed that defendant was twenty-two years old at the time of the murder; defendant presented evidence that he had been neglected and abused as a youth, and that his home environment was very unstable due to his mother's erratic, sometimes alcoholic behavior and the lack of a male role model; and the jury unanimously found that defendant was "reared by a dysfunctional mother," that he "grew up in a situation in which there was a significant lack of stability and guidance," that he was emotionally abused and neglected as a child, and that he "did not have the benefit of a normal education as a child."

Am Jur 2d, Criminal Law §§ 598, 599; Homicide §§ 553, 554.

8. **Criminal Law § 1363 (NCI4th) — mitigating circumstance — learning to read while incarcerated**

The jury's findings as mitigating circumstances that defendant lacked the benefit of a normal education and that he can "function adequately and appropriately in a structured setting with proper guidance and discipline" did not foreclose the possibility that a reasonable juror could find additional mitigation from the uncontroverted fact that defendant learned to read while previously incarcerated.

Am Jur 2d, Criminal Law §§ 598, 599; Homicide §§ 553, 554.

9. **Criminal Law § 1363 (NCI4th) — catchall mitigating circumstance — sufficient evidence**

There was substantial, credible evidence from which a reasonable juror could have found the catchall mitigating circumstance in a first degree murder case where defendant presented testimony that he "adjusted real well" to being in a foster home and that he went to school regularly, attended church, and made improvements in his social behavior, but that these improvements seemed to disappear when he resumed living with his mother.

Am Jur 2d, Criminal Law §§ 598, 599; Homicide §§ 553, 554.

Justice MARTIN dissenting.

Justices MEYER and MITCHELL join in this dissenting opinion.

APPEAL of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by *Battle, J.*, at the 12 September 1988 Criminal Session of Superior Court, CUMBERLAND County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 11 September 1991.

*Lacy H. Thornburg, Attorney General, by William N. Farrell, Jr., Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Staples Hughes, Assistant Appellate Defender, for defendant appellant.*

WHICHARD, Justice.

Defendant was tried on an indictment charging him with the first-degree murder of Ronnie Seiger. The jury returned a verdict finding defendant guilty of first-degree murder upon the theory of premeditation and deliberation. Following a sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended and the trial court imposed the death penalty. For the reasons discussed herein, we conclude that the guilt phase of defendant's trial was free from prejudicial error, but that he is entitled to a new capital sentencing proceeding under *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990).

The State presented evidence at trial tending to show that Ronnie Seiger (the victim) and Miles Nelson Raynor were seated in an automobile near Raynor's trailer when defendant walked up to the automobile with a sawed-off shotgun, demanded the payment of a debt from the victim, and then shot the victim in the head from close range. The victim died immediately.

Miles Raynor was the victim's cousin and the defendant's neighbor. Raynor testified that on 23 May 1987, he lived with his family in the same trailer park as defendant. On that day, he drove with the victim to a package store to make a purchase and then they went back to Raynor's trailer to pick up glasses and ice. As Raynor got back in the car with the glasses, he saw Mary Sikora walking through the trailer park in their direction. She stopped briefly at defendant's trailer, and then proceeded

towards Raynor and the victim. Sikora walked up to the driver's
side of the car and began speaking with Raynor. Defendant came
out from his trailer and walked around the front of the car to
the passenger side where the victim sat. Raynor testified that
defendant then began "hollering" at the victim, "Where is my [ex-
pletive] money, man? I want my [expletive] ten dollars." The victim
responded, "I haven't got it man. I'm broke right now." Immediately
afterwards, according to Raynor, there was an explosion which
caused the victim to slump over in the seat. The gunshot that
killed the victim splattered Raynor and Mary Sikora with blood,
skull fragments, and brain matter.

Mary Sikora testified that she knew defendant and the victim.
She knew the victim had been at defendant's trailer prior to the
shooting and that defendant had spoken about the victim on three
or four occasions in the months preceding the killing. On these
occasions defendant had said things like, "Heads are going to roll
if I don't get my money" and "I'm going to get him, I'll get my
money." Sikora also heard defendant tell the victim's cousin, Harlan
Raynor, "Tell your cousin I want my ten dollars, . . . because
heads will roll if I don't get my money." Defendant told Sikora's
boyfriend, David Adams, the same thing.

On 23 May 1987, Sikora went to the trailer park to help a
friend wash a car. As she walked through the trailer park, she
saw Miles Raynor getting into his car. She also passed by defend-
ant's trailer, at which point defendant came to the edge of his
trailer and asked her if the boy in the car with Raynor was the
one who owed him ten dollars. Sikora testified that she could not
tell at first who else was in the car, but when she saw that it
was Ronnie Seiger, she nodded her head "yes" to defendant. De-
fendant followed her as she made her way to Raynor's car. Accord-
ing to Sikora, defendant went to the passenger side window of
the car, where the victim sat, and said in a loud voice, "Boy, where
is my ten dollars you owe me?" The victim patted his legs and
said, "Man, I'm broke right now. I ain't got ten dollars." Defendant
then said, "Boy, I want my ten dollars or I'm going to blow your
[expletive] brains out." Defendant then "slapped" his hands together
and there was a loud explosion that killed the victim and covered
Sikora and Raynor with blood and brain tissue.

Nora Jean Towery conducted a yard sale in the trailer park
on the day of the shooting. She saw the confrontation between

defendant and the victim at the car, and she corroborated the account given by Miles Raynor and Mary Sikora.

Harlan Raynor, Miles' brother and a cousin of the victim, testified that defendant asked about the victim several times in the two weeks preceding the shooting. Defendant asked when the victim would be back around, and said, "Well, he'd better come around pretty soon or I'm going to start getting a little ill." Two days before the shooting, defendant told Harlan he was going to get even with the victim and that "some heads were going to roll" because the victim owed a debt to him. Tammy Horne, an acquaintance of Harlan Raynor, corroborated Harlan's account of the conversation.

David Adams testified that he knew both defendant and the victim. During several conversations within the three months prior to the shooting, defendant told Adams he would "get Ronnie" and he was "going to blow [the victim's] head off." Adams said defendant told him the source of the ten dollar debt from the victim was the victim's failure to pay defendant for some marijuana.

Defendant turned himself in to law enforcement officers within hours of the shooting. He also took them to the place where he had hidden the shotgun. The murder weapon was a single action, single barrel, sawed-off twelve gauge shotgun. In order to fire the gun, the hammer had to be cocked and the trigger had to be pulled back fully. The weapon had a trigger pull of two and one-half pounds, but its internal safety, or hammer block, did not function reliably. The normal trigger pull for such a gun is approximately seven pounds. On recross-examination, the State's expert testified that the weakness of the mainspring caused the gun to fire unreliably and was probably also the cause of the light trigger pull.

Defendant testified in his own behalf. He stated that he had met the victim approximately two months before the shooting when Harlan Raynor and the victim came to defendant's trailer to buy marijuana. The victim gave defendant half of the money for the marijuana and said he would owe the balance ($10.00). About one month after the marijuana transaction, defendant saw the victim at a nearby convenience store. Cursing, the victim came towards defendant's car; when defendant got out of the car, the two men fought. The victim was a large man and he struck defendant in

the head, knocked him to the ground, and kicked him. Only after a friend intervened did defendant escape.

Defendant testified that the murder weapon actually belonged to another resident of the trailer park and that he was keeping the gun for the other resident in order to keep it away from the resident's alcoholic roommate. Defendant placed the gun in a compartment in a footstool in his living room; he did not know the gun was loaded, and he did not remove it before the day he shot the victim.

Defendant did not go to work on 23 May 1987; instead, he went fishing and stayed around his house. That afternoon defendant saw Miles Raynor drive up in his car. Defendant decided he would ask about the money the victim owed him. Defendant testified that he put the sawed-off shotgun in his pocket because he knew Miles Raynor and the victim could be violent. Defendant spoke briefly with Mary Sikora as she passed, then he walked over to Raynor's car. Defendant then "asked [the victim] if he had my money, and—I asked him if he had my ten dollars. And he said, no, he didn't. And I asked him if he had any intentions of paying me, and he said, yes, but he was broke right then." Defendant testified:

> I thought that he had the money; and I reached in my back pocket and pulled the gun out, to scare him. . . . When I pulled the gun out, I may or may not have pulled the [hammer] back, I'm not quite sure, but . . . it just happened so fast. All of a sudden the—I brought the gun up and the gun went off.

Because he was scared, defendant ran away from the scene. Defendant testified that he had not meant to kill the victim, that he knew that he had done wrong, and that he was sorry. Joseph Ivy and Danny Hedgepeth both testified that defendant told them shortly after the shooting that it was accidental.

The jury deliberated for thirteen minutes before returning a verdict of guilty of first-degree murder. In the sentencing phase, the State presented evidence supporting the aggravating circumstance that defendant "knowingly created a great risk of death to more than one person by means of a weapon which would normally be hazardous to the lives of more than one person." The jury found this aggravating circumstance. Defendant presented substan-

STATE v. TURNER

[330 N.C. 249 (1991)]

tial mitigating evidence from which the jury found twelve of the sixteen submitted mitigating circumstances.

[1] By his first assignment of error defendant contends that the trial court improperly allowed the prosecuting attorney to impeach him during cross-examination with three purported prior convictions. Defendant asserts that the prior convictions were in fact void for lack of jurisdiction.

Prior to trial defendant moved to prohibit the State from using for any purpose the three convictions at issue—(1) a 1981 misdemeanor conviction for receiving stolen goods, (2) a 1985 conviction for assault with a deadly weapon, and (3) a 1985 worthless check conviction. Defendant attached to his motion an affidavit by his attorneys stating that they had personally examined all the documents in the case files for each of the three purported convictions. In the affidavit the attorneys informed the trial court of the nature of the warrant upon which defendant had been charged in each case and the actual plea that ensued. The prosecuting attorney opposed defendant's motion on the grounds that it was not the proper time for defendant to attempt to set aside those convictions. The trial court denied defendant's motion. Before testifying, defendant renewed his objection to the trial court's ruling on the purported convictions. The State ultimately cross-examined defendant with the purported convictions.

As to each of the three convictions listed above, defendant argues that the trial court that received his guilty plea lacked jurisdiction because in each instance the offense to which he pled guilty was not a lesser included offense of the offense with which he was charged. In 1981, defendant pled guilty to a misdemeanor offense of receiving stolen goods, yet he was charged in that case with breaking or entering and larceny. Receiving stolen goods is not a lesser included offense of larceny—*State v. Brady*, 237 N.C. 675, 677-78, 75 S.E.2d 791, 792-93 (1953); *State v. Burnette*, 22 N.C. App. 29, 31, 205 S.E.2d 357, 358 (1974)—and it has no elements in common with breaking or entering. *See* Benjamin B. Sendor, *North Carolina Crimes: A Guidebook on the Elements of Crime* 111-13, 161-62 (3d ed. 1985). In 1985, defendant pled guilty to assault with a deadly weapon, but he was charged with the offense of discharging a firearm into an occupied motor vehicle. The former offense is not included within the latter. *State v. Bland*, 34 N.C. App. 384, 386, 238 S.E.2d 199, 201 (1977), *disc. rev. denied*, 294

N.C. 183, 241 S.E.2d 518 (1978). In 1985, defendant also pled guilty to passing a worthless check, yet he was charged with uttering a forged check. These two offenses contain different elements. *See* Sendor, *supra* at 182-86, 195-97.

Thus, in each case defendant pled guilty to an offense with which he was not charged. According to defendant, the convictions are therefore void because "[t]here can be no trial, conviction, or punishment for a crime without a formal and sufficient accusation. In the absence of an accusation the court acquires no jurisdiction whatever, and if it assumes jurisdiction a trial and conviction are a nullity." *McClure v. State*, 267 N.C. 212, 215, 148 S.E.2d 15, 17-18 (1966) (quoting 42 C.J.S., Indictments and Informations, § 1). Further, defendant argues that collateral attack of the prior void convictions is proper because "[a]n order is void *ab initio* . . . when it is issued by a court that does not have jurisdiction. Such an order is a nullity and may be attacked either directly or collaterally, or may simply be ignored." *State v. Sams*, 317 N.C. 230, 235, 345 S.E.2d 179, 182 (1986).

Finally, defendant argues that the use of the void convictions to impeach him was error of constitutional magnitude. Where a defendant is impeached with evidence of prior convictions obtained in derogation of defendant's right to counsel, our Court of Appeals has stated: "The use of prior void convictions for purposes of impeachment of a criminal defendant deprives him of due process where their use might well have influenced the outcome of the case." *State v. Vincent*, 35 N.C. App. 369, 373, 241 S.E.2d 390, 393 (1978) (citing *Loper v. Beto*, 405 U.S. 473, 31 L. Ed. 2d 374 (1972) ); *see also State v. Atkinson*, 39 N.C. App. 575, 251 S.E.2d 677 (1979).

In response, the State argues that defendant bears the burden of proving that the prior convictions were void. *See State v. Smith*, 96 N.C. App. 235, 385 S.E.2d 349 (1989), *disc. rev. denied*, 326 N.C. 267, 389 S.E.2d 119 (1990) (defendant has burden of showing prior guilty pleas invalid as involuntary or unknowing); *see also* N.C.G.S. § 15A-980(c) (1988) (defendant has burden of proving conviction's invalidity due to right to counsel violation). The State contends that defendant has failed to meet his burden because the only evidence before the trial court pertaining to the validity of the prior convictions was defense counsels' affidavit concerning their examination of court records. Defendant did not offer the

court files or certified copies in support of his contentions. The State argues that we should not hold that defendant has met his evidentiary burden, especially in light of *State v. Thompson*, 309 N.C. 421, 307 S.E.2d 156 (1983) (prosecuting attorney's representations of defendant's prior convictions, standing alone, do not prove the convictions for purposes of Fair Sentencing Act aggravation); *State v. Payne*, 327 N.C. 194, 393 S.E.2d 158 (1990), *cert. denied*, --- U.S. ---, 112 L. Ed. 2d 1062 (1991) (defense attorney's affidavit as to race of peremptorily challenged juror insufficient to support challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986) ); and *State v. McCarver*, 329 N.C. 259, 404 S.E.2d 821 (1991) (trial court's affidavit insufficient to show harmless error from unrecorded conversations with jurors excluded by the court).

Assuming *arguendo* that the convictions at issue are void and that defense counsels' affidavit is sufficient evidence to prove that fact, we conclude that any error in allowing impeachment with the prior void convictions was harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b) (1988). The evidence of defendant's responsibility for the victim's death is overwhelming and uncontested. His defense was primarily "accident," in that he contended that he never intended to kill the victim. That the jury rejected this defense based on the strength of the State's case, and not on the improper impeachment of defendant, is beyond doubt.

The State presented numerous witnesses who testified that in the months and weeks preceding the shooting defendant had stated with respect to the victim that "heads were going to roll" if he did not get his money, that he was going to "get" the victim, and that he was "going to blow [the victim's] head off." Mary Sikora, who was standing just a few feet away from defendant when he approached the victim, testified that she heard defendant say, "I want my ten dollars or I'm going to blow your [expletive] brains out." Further, it is uncontradicted that defendant approached the victim with a sawed-off, single-action shotgun that would not fire unless defendant cocked the hammer and pulled back the trigger. The State impeached defendant not only with the three allegedly void convictions, but also with a previous larceny conviction, the fact that defendant sold drugs, the fact that he possessed an illegal sawed-off shotgun, and the fact that the statements he made to police after the shooting were substantially different from the testimony he offered at trial. The jury deliberated for only thirteen minutes; it is exceedingly unlikely that the mention of the prior

convictions at issue here affected its deliberations in any material respect. For the foregoing reasons, defendant is not entitled to relief under this assignment of error.

[2]   Next, defendant contends that the trial court erred by instructing the jury during the guilt phase of the trial that it could infer the malice element of first-degree murder simply by finding that defendant killed the victim with a deadly weapon. In so doing, defendant contends the court unconstitutionally allowed the jury to find an essential element of first-degree murder, malice, without regard to whether the State had proven an intentional killing.

The trial court instructed in conformity with the North Carolina Pattern Jury Instructions as follows:

I now charge you that for you to find the defendant guilty of first degree murder, the State must prove five things beyond a reasonable doubt as follows:

First, that the defendant intentionally and with malice killed Ronald M. Seiger, Jr., with a deadly weapon. Malice means not only hatred, ill will or spite as it is ordinarily understood — to be sure that is malice — but it also means the condition of mind which prompts a person to take the life of another intentionally or to intentionally inflict serious bodily harm which proximately results in his death without just cause, excuse or justification.

If the State proves beyond a reasonable doubt that the defendant *killed Ronald Seiger with a deadly weapon or intentionally inflicted a wound upon him with a deadly weapon* that proximately caused his death, you may infer, first, that the killing was unlawful and, second, that it was done with malice, but you are not compelled to do so. You may consider this along with all other facts and circumstances in determining whether the killing was unlawful and whether it was done with malice. (Emphasis added.)

I instruct you that a sawed-off shotgun is a deadly weapon.

*See* N.C.P.I. Crim. 206.13.

In *State v. Hedgepeth*, 330 N.C. 38, 408 S.E.2d 309 (1991), we held that virtually identical instructions constituted error (but not plain error) because they omitted the word "intentionally" before the word "killed" in the above italicized language. In contrast to

*Hedgepeth*, defendant here did object to the erroneous instruction. In determining the harmfulness of the error we consider the challenged portion of the instructions in light of the entire charge. *See State v. Boykin*, 310 N.C. 118, 125, 310 S.E.2d 315, 319 (1984). Assuming *arguendo* that defendant is correct in arguing that the standard for constitutional error applies, *i.e.*, that the State must prove the error harmless beyond a reasonable doubt, N.C.G.S. § 15A-1443(b) (1988), we conclude that the error was in fact harmless.

First, given the trial court's instructions as a whole there is no reasonable possibility that the jury interpreted the challenged instruction to allow it to infer malice regardless of whether defendant intentionally used the shotgun to kill the victim. As the instructions show, the first element of the State's case was to prove that "the defendant intentionally and with malice killed [the victim] with a deadly weapon." The court instructed the jury that malice meant "the condition of mind which prompts a person to take the life of another intentionally or to intentionally inflict serious bodily harm." Immediately thereafter, the court gave the erroneous instruction. Near the close of its instructions, the court returned to the subject of the State's burden to prove the essential elements of first-degree murder, stating, "I charge you that if you find from the evidence beyond a reasonable doubt that . . . the defendant . . . *intentionally killed [the victim] with a deadly weapon* thereby proximately causing his death." (Emphasis added.) Thus, the court repeatedly demanded of the jury, as a prerequisite to a verdict of guilty of first-degree murder, that it find that defendant intentionally used the shotgun to cause the victim's death. *See State v. Hedgepeth*, 330 N.C. at 51, 409 S.E.2d at 316-17.

Second, the trial court in this case gave accurate instructions on accident. The court instructed:

> Now, members of the jury, where evidence is offered that tends to show that the victim's death was accidental, and you find that the killing was in fact accidental, the defendant would not be guilty of any crime, even though his acts were responsible for the victim's death.

> A killing is accidental if it is unintentional, occurs during the course of lawful conduct, and does not involve culpable negligence. A killing cannot be premeditated or intentional or culpably negligent if it was the result of an accident.

STATE v. TURNER

[330 N.C. 249 (1991)]

When the defendant asserts that the victim's death was the result of an accident, he is in effect denying the existence of those facts which the State must prove beyond a reasonable doubt in order to convict him. Therefore, the burden is on the State to prove those essential facts, and in so doing, disprove the defendant's assertion of accidental death. The State must satisfy you beyond a reasonable doubt that the victim's death was not accidental before you may return a verdict of guilty of any crime.

The trial court's instructions to the jury required it to find unanimously and beyond a reasonable doubt that the shooting was not accidental. In convicting defendant of first-degree murder, the jury so concluded. It also concluded that defendant shot the victim with the specific intent to kill, and that he did so after premeditation and deliberation. Defendant's assertion that the trial court's instructions allowed the jury to find malice without an intentional act on defendant's part is meritless.

It is settled law that " '[w]here the death of a human being is the result of accident or misadventure, in the true meaning of the term, no criminal responsibility attaches to the act of the slayer.' " *State v. Phillips*, 264 N.C. 508, 512, 142 S.E.2d 337, 340 (1965) (quoting *State v. Faust*, 254 N.C. 101, 112, 118 S.E.2d 769, 776 (1961)); *see also State v. Jones*, 287 N.C. 84, 100, 214 S.E.2d 24, 35 (1975); *State v. Withers*, 271 N.C. 364, 369, 156 S.E.2d 733, 737 (1967); *State v. McLawhorn*, 270 N.C. 622, 628, 155 S.E.2d 198, 203 (1967). The defense of accident "is triggered in factual situations where a defendant, without premeditation, intent, or culpable negligence, commits acts which bring about the death of another. . . . It is not an affirmative defense, but acts to negate the *mens rea* element of homicide." *State v. Lytton*, 319 N.C. 422, 425-26, 355 S.E.2d 485, 487 (1987).

By rejecting the defense of accident, the jury in fact concluded that defendant's acts were intentional. The evidence was uncontradicted that the killing was perpetrated by the use of a firearm. This, in turn, gave rise to the permissible inference that the killing was unlawful and committed with malice. *See State v. Forrest*, 321 N.C. 186, 191, 362 S.E.2d 252, 255 (1987). Defendant's "accident" defense does not operate to rebut the inference of malice so as to reduce the homicide from murder to manslaughter; to the contrary, as stated above, it operates to remove criminal responsibility

entirely. *See State v. Phillips*, 264 N.C. 508, 142 S.E.2d 337. Defendant does not contend that there was evidence that the killing was done in self-defense or in the heat of passion upon sudden provocation such as would rebut the inference. *See State v. Reynolds*, 307 N.C. 184, 297 S.E.2d 532 (1982). Thus, the jury properly was allowed to draw the inference of malice as instructed by the trial court.

[3] Because we conclude that the jury in fact concluded that defendant intentionally caused the death of the victim through the use of the loaded shotgun, the trial court's instruction that "a sawed-off shotgun is a deadly weapon" was proper as well. *See State v. Gordon*, 241 N.C. 356, 358-59, 85 S.E.2d 322, 324 (1955). "An instrument which is likely to produce death or great bodily harm under the circumstances of its use is properly denominated a deadly weapon." *State v. Joyner*, 295 N.C. 55, 64, 243 S.E.2d 367, 373 (1978). Defendant is not entitled to relief under these assignments of error. We do, however, suggest that the pattern instructions be amended in light of *Hedgepeth* and this decision.

[4] By his next assignment of error, defendant contends that the trial court made insufficient efforts to protect his constitutional right to an impartial jury from the prejudicial impact of the emotional behavior of the victim's loved ones who were present during the trial. Just before the State presented rebuttal evidence, the trial court noted openly its concern with the emotional displays, stating to the prosecuting attorney:

COURT: Let me say this. I have been a little bit concerned with the people over here. I certainly understand the situation.

[PROSECUTING ATTORNEY]: I'll have a talk with them.

COURT: About their leaving and some display of emotion and so on. I'm inclined to think it might be best when we have the final jury arguments if they sat back out in the courtroom.

During the State's rebuttal, the witnesses were seated in the first row of the spectator section. Before closing arguments, the court had them moved to the second row of the spectator section. Immediately before the return of the verdict, the court again spoke with the prosecuting attorney:

[PROSECUTING ATTORNEY]: I also had a conversation about the emotional aspect of the case with the victim's friends and

family and have asked them if they can't contain themselves to please leave the courtroom and to remain out.

COURT: Well, I appreciate that. Of course, we all understand how they feel about it. It's perfectly natural to feel the way they do.

[PROSECUTING ATTORNEY]: Yes, sir.

COURT: But we appreciate that.

[PROSECUTING ATTORNEY]: Thank you, judge.

COURT: I do want to warn them that when the jury does return a verdict, to please be very careful not to say anything or anything of that kind to—here in the courtroom to any of the jurors or anything of that kind.

The transcript does not indicate, however, that defendant ever objected to the emotional displays, requested curative instructions, or moved for a mistrial. In *State v. Locklear*, 322 N.C. 349, 368 S.E.2d 377 (1988), when the State called as a witness the victim's widow, the bailiff informed the court that she was unable to testify then because she was crying. The court took a brief recess and sent the jury to the jury room with instructions not to speak about the case and to keep an open mind. This Court noted that defendant did not request a curative instruction or move for a mistrial, and it rejected defendant's argument that he was denied a fair and impartial trial. It said:

The trial court witnessed the incident and was in a position to gauge its effect on the jury. . . . "Aside from defendant's failure to request a curative instruction, such an instruction may well have highlighted the witness's emotional state; indeed it is possible that the defense attorney declined to request a curative instruction because of the likelihood that it would emphasize the witness's outburst."

*Id.* at 359, 368 S.E.2d at 383-84 (quoting *State v. Blackstock*, 314 N.C. 232, 245, 333 S.E.2d 245, 253 (1985)).

In *Blackstock*, defendant moved for a mistrial after a prosecuting witness became hysterical during the jury instructions. The trial court ordered the bailiff to remove the witness from the courtroom, then it resumed instructing the jury. This Court held that the trial court did not abuse its discretion in denying a mistrial.

"A mistrial is appropriate only when there are such serious improprieties as would make it impossible to attain a fair and impartial verdict under the law." *State v. Blackstock*, 314 N.C. at 243-44, 333 S.E.2d at 252.

Similarly, in *State v. McGuire*, 297 N.C. 69, 254 S.E.2d 165, *cert. denied*, 444 U.S. 943, 62 L. Ed. 2d 310 (1979), the Court found no abuse of discretion where the trial court denied two defendants' motions for severance and mistrial where a third codefendant made "numerous outbursts" during the course of the trial. The Court stated:

> "When such an incident involving an unexpected emotional outburst occurs, the judge must act promptly and decisively to restore order and to erase any bias or prejudice which may have been aroused. Whether it is possible to accomplish this in a particular case is a question necessarily first addressed to the sound discretion of the trial judge. 'Not every disruptive event occurring during the course of trial requires the court automatically to declare a mistrial,' and if in the sound discretion of the trial judge it is possible despite the untoward event, to preserve defendant's basic right to receive a fair trial before an unbiased jury, then the motion for mistrial should be denied. On appeal, the decision of the trial judge in this regard is entitled to the greatest respect. He is present while the events unfold and is in a position to know far better than the printed record can ever reflect just how far the jury may have been influenced by the events occurring during the trial and whether it has been possible to erase the prejudicial effect of some emotional outburst. Therefore, unless his ruling is clearly erroneous so as to amount to a manifest abuse of discretion, it will not be disturbed on appeal."

*Id.* at 75, 254 S.E.2d at 169-70 (quoting *State v. Sorrels*, 33 N.C. App. 374, 376-77, 235 S.E.2d 70, 72, *cert. denied*, 293 N.C. 257, 237 S.E.2d 539 (1977)).

We find no abuse of discretion on the facts of this case as well. No single outburst such as in *Blackstock*, or "numerous outbursts" as in *McGuire*, occurred here. Rather, the emotional displays in this case were constant factors during the trial. Though the cumulative effect may have been prejudicial to defendant, we cannot conclude that the trial court's actions, or inaction, constituted a manifest abuse of discretion. The court was aware of the potential

prejudice to defendant, and it took steps to ameliorate it by having the witnesses moved out of the bar area and into the spectator area. Just as defense counsel likely was unwilling to object openly to the emotional behavior for fear of calling attention to it or alienating the jury, the trial court may have concluded that the better course was to leave control of the family's behavior to the prosecuting attorney.

The unfortunate reality of a capital trial includes both the grief and anguish of those the victim has left behind and the awesome uncertainty as to the accused's fate. It is the trial court's responsibility to keep these powerful emotions in check in order to assure an impartial jury and a fair trial. Only in rare and obvious instances of unmitigated and unfair prejudice, however, will the exercise of, or failure to exercise, that responsibility result in a finding of an abuse of discretion. This is not such a case. Defendant's assignment of error is overruled.

[5] Defendant next contends that he is entitled to a new capital sentencing proceeding because the trial court instructed the jury that it must be unanimous in order to find the existence of any mitigating circumstance offered by defendant. In *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990), the United States Supreme Court held such an instruction to be unconstitutional. Our review of the record reveals that the unanimity instructions held erroneous in *McKoy* were given here. The State acknowledges that the instructions violated *McKoy*, but argues that the error was harmless. Because the error is of constitutional dimension, the State bears the burden of showing that it was harmless beyond a reasonable doubt. *State v. McKoy*, 327 N.C. 31, 44, 394 S.E.2d 426, 433 (1990); N.C.G.S. § 15A-1443(b) (1988). We conclude that the State has failed to meet its burden.

The trial court submitted and the jury found only one aggravating circumstance—"the defendant knowingly create[d] a great risk of death to more than one person by means of a weapon which would normally be hazardous to the lives of more than one person." *See* N.C.G.S. § 15A-2000(e)(10) (1988). This circumstance was supported by evidence that defendant fired a sawed-off shotgun into an automobile occupied by the victim and Miles Raynor, with Mary Sikora standing in dangerously close proximity.

The trial court submitted sixteen possible mitigating circumstances to the jury, and the jury unanimously found twelve.

It rejected the following four mitigating circumstances: (1) that defendant had no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1); (2) the defendant's age at the time of the offense, N.C.G.S. § 15A-2000(f)(7); (3) that defendant learned to read on his own in jail; and (4) any other circumstance or circumstances arising from the evidence which the jury deems to have mitigating value, N.C.G.S. § 15A-2000(f)(9).

[6] There was evidence from which members of the jury could have found each of these circumstances. The record before the jury of defendant's adjudicated criminal activity consisted solely of misdemeanor offenses: receiving stolen goods in 1981, larceny in 1984, and worthless check and assault with a deadly weapon in 1985. There also was evidence of unadjudicated criminal activity— possession of marijuana and an incident of theft when defendant was a juvenile, the sale of marijuana to the victim which ultimately led to the fatal altercation, and possession of a sawed-off shotgun. The State contends that no reasonable person could have found this mitigating circumstance to exist. We disagree. As in *State v. Lloyd*, 321 N.C. 301, 364 S.E.2d 316 (1988), *death penalty vacated*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990):

> We do not suggest that the evidence in the present case would support a finding of *no* history of prior criminal activity. N.C.G.S. § 15A-2000(b) does not require such evidence before the mitigating circumstance must be submitted for the jury's consideration. Rather, the statute places upon the trial court the duty to determine whether the evidence will support a reasonable finding of the mitigating circumstance of "no *significant* history of prior criminal activity." In the case at bar, the trial court was required to consider the evidence of the defendant's [seven alcohol-related] misdemeanor convictions in conjunction with his [two] twenty-year-old felony convictions to determine whether his record as a whole would support a reasonable jury finding of the mitigating circumstance . . . . The trial court correctly concluded that the evidence in this case would support such a finding.

*Id.* at 312-13, 364 S.E.2d at 324 (emphasis in original). This Court, in a subsequent hearing of the case, ordered a new sentencing proceeding because of the operation of the erroneous *McKoy* instruction on the jury's consideration of the "no significant history

of prior criminal activity" mitigating circumstance. *State v. Lloyd*, 329 N.C. 662, 668, 407 S.E.2d 218, 222 (1991).

Certain aspects of *Lloyd* are distinguishable from this case, for example, the remoteness of the felony convictions and the non-violent, though dangerous, alcohol-related misdemeanors. Here, the defendant's criminal activity is not so remote, but, unlike in *Lloyd*, it does not include felony convictions. We have upheld the submission of this mitigating circumstance on records of criminal activity as great or greater than defendant's here. *See State v. McNeil*, 327 N.C. 388, 395 S.E.2d 106 (1990), *cert. denied*, --- U.S. ---, 113 L. Ed. 2d 459 (1991) (conviction for voluntary manslaughter); *State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589 (1988) (conviction of second-degree kidnapping, evidence of drug storage on the defendant's premises, and involvement in felonious breaking or entering and larceny); *State v. Brown*, 315 N.C. 40, 337 S.E.2d 808 (1985) (convictions on six counts each of felonious breaking or entering and felonious larceny, five counts of armed robbery, and one count of felonious assault), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled on other grounds*, 321 N.C. 570, 364 S.E.2d 373 (1988). In light of these cases, we cannot conclude that the trial court here erred in submitting this circumstance, as a reasonable juror could find it to exist.

[7] As for defendant's age, we have said that, "Any hard and fast rule as to age would tend to defeat the ends of justice, so the term youth must be considered as relative and this factor weighed in the light of varying conditions and circumstances." *State v. Oliver*, 309 N.C. 326, 372, 307 S.E.2d 304, 333 (1983) (quoting with express approval *Giles v. State*, 261 Ark. 413, 421, 549 S.W.2d 479, 483, *cert. denied*, 434 U.S. 894 (1977) ). Defendant was twenty-two years old at the time of the shooting. He presented evidence that he had been neglected and abused as a youth, and that his home environment was very unstable due to his mother's erratic, sometimes alcoholic behavior and the lack of a male role model. In fact, the jury unanimously found that defendant was "reared by a dysfunctional mother," that he "grew up in a situation in which there was a significant lack of stability and guidance," that he was emotionally abused and neglected as a child, and that he "did not have the benefit of a normal education as a child." All these circumstances, in conjunction with his actual age of twenty-two, could have permitted a reasonable juror to find this statutory mitigating circumstance. Further, the fact that certain "found"

mitigating circumstances might bear on the persuasiveness of another circumstance under consideration does not mean that the latter necessarily is subsumed under the former.

The jury was not required to accept this circumstance. There was evidence that defendant had married and that he maintained employment during the year before the shooting. Further, the evidence of his prior criminal activity could have convinced some jurors that defendant was mature beyond his years. Yet, these are facts that each juror should have been permitted to evaluate individually in considering this mitigating circumstance. We conclude that it was proper to submit this circumstance in that a reasonable juror could have accepted the evidence of defendant's age as having mitigating value. *See State v. Williams*, 305 N.C. 656, 663, 292 S.E.2d 243, 249, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982) (jury found this circumstance where the defendant was twenty-four at the time of the murder, and where he had maintained gainful employment since he was a teenager); *cf. State v. Johnson*, 317 N.C. 343, 393, 346 S.E.2d 596, 624 (1986) (no prejudicial error to refuse to submit the defendant's age as a mitigating circumstance in light of two witnesses' conclusory statements that the defendant was emotionally immature and other evidence of his apparently normal physical and intellectual development).

[8] The evidence was uncontradicted with regard to the third submitted, but rejected, mitigating circumstance, that defendant learned to read while previously incarcerated. In fact, the trial court instructed the jury to that effect. Again, though this circumstance is related to other circumstances that the jury found unanimously, it was not subsumed by the other circumstances. That the jury found mitigation in the circumstances that defendant lacked the benefit of a normal education and that he can "function adequately and appropriately in a structured setting with proper guidance and discipline" does not foreclose the possibility that a reasonable juror could find additional mitigation from the uncontroverted fact that defendant had made significant efforts to improve himself while previously incarcerated. Because of the erroneous *McKoy* instruction, "we are unable to say beyond a reasonable doubt, particularly in light of the mitigating circumstances actually found, that an error preventing a juror from finding an additional mitigating circumstance in this case did not prevent the jury from recommending life imprisonment rather than death." *State v. Stager*,

329 N.C. 278, 327, 406 S.E.2d 876, 904 (1991) (new sentencing pro-
ceeding required where jury unanimously found all four submitted
mitigating circumstances, but rejected "catchall" circumstance).

[9] Finally, as in *Stager*, the jury here rejected the "catchall"
circumstance — "any other circumstance or circumstances arising
from the evidence which you the jury deem to have mitigating
value." *See* N.C.G.S. § 15A-2000(f)(9). There was substantial, cred-
ible evidence from which a reasonable juror could have found this
circumstance. Defendant presented testimony from his foster parents
that he "adjusted real well" to being in the foster home. Defendant
went to school regularly, attended church, and made improvements
in his social behavior. These improvements seemed to disappear,
however, when he resumed living with his mother.

In light of the evidence supporting the rejected mitigating
circumstances, we are unable to conclude that the State has carried
its burden of proving that the erroneous *McKoy* instruction was
harmless beyond a reasonable doubt. Therefore, defendant must
receive a new capital sentencing proceeding. Because defendant's
remaining assignments of error relate to issues and matters that
are uncertain to recur upon resentencing, we decline to address them.

For the reasons stated, we find no prejudicial error in the
guilt phase of defendant's capital trial, but remand for a new capital
sentencing proceeding under *McKoy*.

Guilt phase: No error.

Sentencing phase: New sentencing proceeding.

Justice MARTIN dissenting.

I concur in the holding by the majority that there is no error
in the guilt phase of defendant's trial and conviction. However,
I dissent from the holding of the majority that the *McKoy* error
entitles the defendant to a new sentencing proceeding.

The State concedes that the unanimity instructions violated
the mandate of *State v. McKoy*, 494 U.S. 433, 108 L. Ed. 2d 369
(1990), but it argues that the error was harmless. The majority
finds that the error was prejudicial; I cannot concur in that decision.
Of course, the State has the burden of showing that the error
is harmless beyond a reasonable doubt. N.C.G.S. § 15A-1443(b) (1988).

**STATE v. TURNER**

[330 N.C. 249 (1991)]

In this case the trial court submitted sixteen possible mitigating circumstances to the jury, and the jury unanimously found twelve of the mitigating circumstances submitted and rejected four of them. The first of these is that the defendant had no significant history of prior criminal activity. N.C.G.S. § 15A-2000(f)(1) (1988). Without a detailed recitation of the evidence, it does show that since the age of sixteen the defendant had been convicted of or pled guilty to receiving stolen goods, larceny, assault with a deadly weapon, and issuing a worthless check. There was also evidence of other criminal activity, such as, possession of a sawed-off shotgun, dealing in drugs, stealing, and possession of marijuana. Each of these convictions and other criminal activity constitute significant prior criminal activity on the part of the defendant. The meaning of "significant" is that the activity is likely to have influence or effect upon the determination by the jury of its recommended sentence. *State v. Wilson*, 322 N.C. 117, 147, 367 S.E.2d 589, 609 (1988) (Martin, J., concurring). Surely, the jury would be affected in its deliberations and determination of whether to recommend the death sentence by this series of prior convictions and criminal conduct on the part of the defendant. These are not the kind of activities that a jury would be likely to find completely irrelevant on the issue of sentencing. Therefore, no reasonable juror would have found an absence of significant history of prior criminal activity under the evidence of this case. It is clear that if the error in the *McKoy* instructions in this case had been absent the result would have been the same.

Likewise, as to the non-statutory mitigating circumstance that the defendant learned to read on his own while in jail, even if found by the jury or a juror, it would not, in my opinion, have resulted in a change in the jury's recommendation. The evidence is contradictory in this case as to whether the defendant learned to read in jail, and if so, when he went through this educational process. He testified that he read the statements that he gave the officer before he signed them. He also argued that he learned to read in jail during 1981 and 1984, when he was arrested and convicted of other crimes which was, of course, prior to the killing in this case. I do not see how the defendant's culpability for this crime is lessened because the defendant learned to read in jail serving time for other crimes before this crime was committed. Further, the jury found in mitigation that the defendant lacked the benefit of a normal education, and that he can function ade-

quately and appropriately in a structured setting with prior guidance and discipline. This is indeed a slender reed upon which to rely in striking down the jury's recommendation as to the appropriate penalty of this shotgun killing witnessed by two eyewitnesses who testified for the State.

As to the mitigating circumstance of the defendant's age at the time of the offense, N.C.G.S. § 15A-2000(f)(7), the defendant was twenty-two years and six months of age. This Court held in *State v. Johnson*, 317 N.C. 343, 346 S.E.2d 596 (1986), that there was no hard and fast rule as to what age could be considered by the jury as such mitigating circumstance. Rather, this evidence had to be considered along with all of the other evidence in the case in determining whether it had any mitigating value. In the *Johnson* case this Court found that it was not error to fail to submit this circumstance to the jury even though there was testimony that the defendant was an immature person for his age based upon the fact that he was a bed wetter, that he lacked emotional stability, and that he was fired from his first employment. I find the evidence in the present appeal to be much less persuasive than that in *Johnson*. Here, defendant's intelligence level was in the low average range, he was employed, and he was an excellent worker. It appears beyond a reasonable doubt that, even if this mitigating circumstance had been found by the jury, it would not have changed any juror's mind as to the recommendation. I find it to be harmless beyond a reasonable doubt.

As to the catchall mitigating circumstance, defendant argued such things as his showing a positive response while in the custody of foster parents, that his juvenile drug abuse was permitted by his mother, that he was deprived of an opportunity to learn societal values, and that the social service and court system failed to respond to his situation. These facts were already concluded and subsumed in other factors submitted to the jury, such as, that the defendant was reared by a dysfunctional mother, that he grew up in a situation with no stability or guidance, that he was emotionally abused and neglected as a child, that he can function adequately in a structured setting of proper guidance, that he has a father and foster parent who love him, and that he did not have the benefit of a normal education as a child. All of these mitigating factors were found by the jury. It appears that the factors now argued by the defendant under the catchall were all included and subsumed in the specific mitigating circumstances

which the jury found. Therefore, it appears beyond a reasonable doubt that there was no error with respect to the catchall. N.C.G.S. § 15A-2000(f)(9) (1988).

In light of the uncontested evidence as to the brutal and uncalled for murder in this case, evidently over a $10.00 debt that the victim allegedly owed to the defendant in payment for drugs, no reasonable juror would have returned a different recommendation had there been no *McKoy* error. I find that the *McKoy* error here is indeed harmless beyond any reasonable doubt.

I vote that the jury's recommendation of the death sentence be affirmed.

Justices MEYER and MITCHELL join in this dissenting opinion.